Filed 8/30/18

# IN THE SUPREME COURT OF CALIFORNIA

SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP,

      Plaintiff and Respondent,

      v.

J-M MANUFACTURING COMPANY, INC.,

      Defendant and Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

S232946

Ct.App. 2/4 B256314

Los Angeles County
Super. Ct. No. YC067332

       A large law firm agreed to represent a manufacturing company in a federal qui tam action brought on behalf of a number of public entities. During the same time period, the law firm represented one of these public entities in matters unrelated to the qui tam suit. Both clients had executed engagement agreements that purported to waive all such conflicts of interest, current or future, but the agreements did not specifically refer to any conflict and the law firm did not tell either client about its representation of the other. This arrangement fell apart when the public entity discovered the conflict and successfully moved to have the firm disqualified in the qui tam action. A fight over the manufacturer's outstanding law firm bills followed, and the dispute was sent to arbitration in accordance with an arbitration clause in the parties' engagement agreement.

       The arbitrators ruled in the law firm's favor and the superior court confirmed the award, but the Court of Appeal reversed. That court concluded that

**1**

SEE CONCURRING AND DISSENTING OPINION

the matter should never have been arbitrated because, notwithstanding the broad conflict waiver in the engagement agreement, the law firm's undisclosed conflict of interest violated rule 3-310(C)(3) of the Rules of Professional Conduct. This ethical violation, the court ruled, rendered the parties' agreement, including the arbitration clause, unenforceable in its entirety. The Court of Appeal further held that the conflict of interest disentitled the law firm from receiving any compensation for the work it performed for the manufacturer while also representing the utility district in other matters.

We agree with the Court of Appeal that, under the framework established in *Loving & Evans v. Blick* (1949) 33 Cal.2d 603, the law firm's conflict of interest rendered the agreement with the manufacturer, including its arbitration clause, unenforceable as against public policy. Although the manufacturer signed a conflicts waiver, the waiver was not effective because the law firm failed to disclose a known conflict with a current client. But we conclude, contrary to the Court of Appeal, that the ethical violation does not categorically disentitle the law firm from recovering the value of the services it rendered to the manufacturer; whether principles of equity entitle the law firm to some measure of compensation is a matter for the trial court to address in the first instance.

**I.**

In 2006, a qui tam action was filed against J-M Manufacturing Company, Inc. (J-M), a pipe manufacturing company, in federal court in California. John Hendrix, the relator in the action, alleged that J-M had misrepresented the strength of polyvinyl chloride pipe it had sold to approximately 200 public entities around the country for use in their water and sewer systems. In early 2010, the complaint was unsealed, and many of these public entities intervened in the case.

As these events were unfolding, J-M began to consider replacing the law firm that had been representing it in the action. In February 2010, shortly after the

2

complaint was unsealed, J-M's general counsel, Camilla Eng, invited attorneys from the law firm of Sheppard, Mullin, Richter & Hampton, LLP (Sheppard Mullin), to discuss taking over the representation from the other law firm. The attorneys, Bryan Daly and Charles Kreindler, ran a conflicts check to determine whether Sheppard Mullin had represented any of the public entities identified as the real parties in interest in the qui tam action. The conflicts check revealed that another Sheppard Mullin attorney, Jeffrey Dinkin, had done employment-related work for a public entity intervener, South Tahoe Public Utility District (South Tahoe), on and off since at least 2002, and most recently in November 2009. South Tahoe had, however, signed an advance waiver of conflicts in cases unrelated to the employment matters on which Dinkin had provided assistance. After internal consultation, Sheppard Mullin's general counsel opined that because of this advance conflict waiver, the firm could take on representation of J-M in the qui tam action.

On March 4, 2010, Sheppard Mullin and J-M signed an engagement agreement. Under the heading "Scope of Representation," the agreement recited that Sheppard Mullin was engaged to represent J-M in the qui tam action. The agreement provided that the representation would terminate on completion of the lawsuit and "any related claims and proceedings," unless the law firm agreed separately to provide J-M other legal services. The agreement recited the terms of the representation, including payment of fees, and provided that these terms would also apply to other engagements for J-M that Sheppard Mullin might undertake, except as the parties otherwise agreed.

The engagement agreement also contained a conflict waiver much like the one South Tahoe had signed. The waiver provision provided:

"Conflicts with Other Clients. Sheppard, Mullin, Richter & Hampton LLP has many attorneys and multiple offices. We may currently or in the future

3

represent one or more other clients (including current, former, and future clients) in matters involving [J-M]. We undertake this engagement on the condition that we may represent another client in a matter in which we do not represent [J-M], even if the interests of the other client are adverse to [J-M] (including appearance on behalf of another client adverse to [J-M] in litigation or arbitration) and can also, if necessary, examine or cross-examine [J-M] personnel on behalf of that other client in such proceedings or in other proceedings to which [J-M] is not a party *provided* the other matter is not substantially related to our representation of [J-M] and in the course of representing [J-M] we have not obtained confidential information of [J-M] material to representation of the other client. By consenting to this arrangement, [J-M] is waiving our obligation of loyalty to it so long as we maintain confidentiality and adhere to the foregoing limitations. We seek this consent to allow our Firm to meet the needs of existing and future clients, to remain available to those other clients and to render legal services with vigor and competence. Also, if an attorney does not continue an engagement or must withdraw therefrom, the client may incur delay, prejudice or additional cost such as acquainting new counsel with the matter."

Although Eng revised certain portions of the engagement agreement before signing, she made no changes to the conflict waiver provision. Sheppard Mullin did not tell J-M about its representation of South Tahoe before or at the time the engagement agreement was signed.

The engagement agreement also contained an arbitration clause, providing that any dispute over fees or charges that was not resolved through voluntary arbitration under the auspices of the California State Bar, and any other type of dispute between the parties, would be settled by "mandatory binding arbitration" conducted in accordance with the California Arbitration Act (CAA; Code Civ.

4

Proc., § 1282 et seq.). The arbitration clause also stated the agreement would be governed by California law.

Dinkin, the Sheppard Mullin employment partner, again began actively working for South Tahoe later in March 2010, a few weeks after Sheppard Mullin began representing J-M. Over the course of the following year, Sheppard Mullin billed South Tahoe for about 12 hours of work. During this period, South Tahoe's attorneys in the qui tam action became aware that Sheppard Mullin was now representing J-M in that action. In March 2011, South Tahoe's attorneys in the qui tam action wrote to Sheppard Mullin asking for an explanation for the firm's failure to inform South Tahoe of the adverse representation. Sheppard Mullin responded by reminding South Tahoe of its earlier conflicts waiver. Dissatisfied with this response, South Tahoe filed a motion to disqualify Sheppard Mullin in the qui tam proceeding.

In July 2011, the district court granted the disqualification motion, ruling that Sheppard Mullin's simultaneous representation of South Tahoe and J-M had been undertaken without adequately informed waivers in violation of rule 3-310(C)(3) of the Rules of Professional Conduct.

During its representation of J-M, Sheppard Mullin performed approximately 10,000 hours of work in the qui tam action and a related state court action. According to Sheppard Mullin attorney Kreindler, the firm's billings totaled more than $3 million, of which more than $1 million remained unpaid.

Sheppard Mullin sued J-M for the unpaid fees. J-M cross-complained for breach of contract, an accounting, breach of fiduciary duty, and fraudulent inducement; it also sought disgorgement of fees previously paid to Sheppard Mullin, as well as exemplary damages.

Sheppard Mullin petitioned for an order compelling arbitration under Code of Civil Procedure section 1281.2. J-M opposed the order, asserting that Sheppard

Mullin's conflict of interest had rendered the parties' entire agreement illegal and unenforceable. Overruling J-M, the superior court granted the petition to compel arbitration.[1]

The arbitrators ruled in Sheppard Mullin's favor. They observed that "the better practice" would have been for the firm to disclose its representation of South Tahoe and seek J-M's specific waiver of the conflict. But the arbitrators concluded that, even assuming Sheppard Mullin's failure to disclose the conflict constituted an ethical violation, the violation was not sufficiently serious or egregious to warrant forfeiture or disgorgement. The arbitrators observed that Sheppard Mullin's representation of South Tahoe involved matters unrelated to the qui tam action and that the conflict of interest had not caused J-M damage, prejudiced its defense of the qui tam action, resulted in communication of its confidential information to South Tahoe, or rendered Sheppard Mullin's representation less effective or less valuable. The arbitrators awarded Sheppard Mullin more than $1.3 million in fees and interest.

Sheppard Mullin petitioned the superior court to confirm the award, but J-M petitioned to vacate it, renewing its contention that the parties' engagement agreement was illegal and unenforceable due to Sheppard Mullin's simultaneous representation of adverse interests in violation of rule 3-310(C)(3) of the Rules of Professional Conduct. Again overruling J-M's objection, the superior court confirmed the award. Citing *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1 (*Moncharsh*), the court held that a violation of the Rules of Professional Conduct does not render a retainer agreement unenforceable. The court concluded that the arbitrators therefore did not exceed their powers in awarding the contractual fees. (Code Civ. Proc., § 1286.2, subd. (a)(4).)

---

[1] J-M petitioned the Court of Appeal for a writ of mandate, but the petition was summarily denied.

6

The Court of Appeal reversed. The court explained that California law, unlike federal law, treats a challenge to the legal enforceability of a contract as a matter for the court to decide, regardless of whether the contract contains an arbitration clause. The appellate court concluded that here, Sheppard Mullin's concurrent representation of J-M and South Tahoe violated rule 3-310(C)(3) of the Rules of Professional Conduct, notwithstanding the scope of the conflict waivers in the parties' respective engagement agreements. This violation, the court concluded, both rendered the engagement agreement with J-M unenforceable and disentitled Sheppard Mullin from any fees for representing J-M while it was simultaneously representing South Tahoe in other matters. For fee calculation purposes, the court remanded to the superior court to determine when precisely Sheppard Mullin's representation of South Tahoe began.

We granted Sheppard Mullin's petition for review. The petition presents three questions: (1) whether a court may invalidate an arbitration award on the ground that the agreement containing the arbitration agreement violates the public policy of the state as expressed in the Rules of Professional Conduct, as opposed to statutory law; (2) whether Sheppard Mullin violated the Rules of Professional Conduct in view of the broad conflicts waiver signed by J-M; and (3) whether any such violation automatically disentitles Sheppard Mullin from any compensation for the work it performed on behalf of J-M. We consider each of these questions in turn.

7

## II.

The threshold question in the case concerns the proper scope of judicial review of the arbitrators' award under the CAA.[2] The CAA is "a comprehensive statutory scheme regulating private arbitration in this state." (*Moncharsh*, *supra*, 3 Cal.4th at p. 9.) "Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Ibid.*) To effectuate that policy, the CAA provides that "[a] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.) Where, as here, an arbitrator has issued an award, the decision is ordinarily final and thus "is not ordinarily reviewable for error by either the trial or appellate courts." (*Moncharsh*, at p. 13.) The exceptions to this rule of finality are specified by statute. As relevant here, the CAA provides that a court may vacate an arbitration award when "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4) (section 1286.2(a)(4)).)

In *Loving & Evans v. Blick*, *supra*, 33 Cal.2d 603 (*Loving & Evans*), this court held that the excess-of-authority exception applies, and an arbitral award must be vacated, when a court determines that the arbitration has been undertaken to enforce a contract that is "illegal and against the public policy of the state."

---

[2]    As noted, the parties' agreement calls for application of California law, including the CAA, and both parties agree that the CAA governs. This case thus presents no question concerning application of the Federal Arbitration Act, 9 United States Code section 1 et seq. (See *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 470; *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 387.)

(*Loving & Evans*, at p. 610 (plur. opn. of Spence, J.); see *id.* at p. 615 (conc. opn. of Edmonds, J.).) Sheppard Mullin does not ask us to revisit that holding. It does, however, argue that the *Loving & Evans* illegality exception should apply only to contracts that are found to violate public policy as it has been declared by the Legislature. Because the Rules of Professional Conduct are not promulgated by the Legislature, Sheppard Mullin argues, a violation of the rules can afford no ground for vacating an arbitration award under section 1286.2(a)(4) of the CAA. We reject the argument.

## A.

Under general principles of California contract law, a contract is unlawful, and therefore unenforceable, if it is "[c]ontrary to an express provision of law" or "[c]ontrary to the policy of express law, though not expressly prohibited." (Civ. Code, § 1667.)

While this court has recognized that "questions of public policy are primarily for the legislative department to determine," we have also held that a contract or transaction may be found contrary to public policy even if the Legislature has not yet spoken to the issue. (*Safeway Stores v. Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 574 ["In cases without number the state courts have declared contracts, transactions and activities . . . to be contrary to public policy where their legislative departments have not spoken on the subject."]; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 82 [administrative regulations promulgated to effectuate statutory authority "may be manifestations of important public policy"].)

As particularly relevant here, California courts have held that a contract or transaction involving attorneys may be declared unenforceable for violation of the Rules of Professional Conduct, the set of binding rules governing the ethical practice of law in the State of California. In *Chambers v. Kay* (2002) 29 Cal.4th

9

142 (*Chambers*), this court refused enforcement of a fee division agreement undertaken without written client consent, on the ground that the arrangement violated the Rules of Professional Conduct.  We noted that the California State Bar is authorized by statute to formulate these rules, and they are adopted with the approval of this court.  (*Chambers*, at p. 156; see Bus. & Prof. Code, §§ 6076–6077.)  To enforce the fee division agreement, we observed, would be to countenance "a violation of a rule we formally approved in order 'to protect the public and to promote respect and confidence in the legal profession.' " (*Chambers*, at p. 158, quoting Rules Prof. Conduct, rule 1–100(A).)  It would be "absurd," we concluded, for a court to aid an attorney in enforcing a transaction prohibited by the rules.  (*Chambers*, at p. 161.)  Both before and after *Chambers*, Courts of Appeal reached similar conclusions about similar fee splitting arrangements in violation of the Rules of Professional Conduct.  As the court explained in *Altschul v. Sayble* (1978) 83 Cal.App.3d 153, the rules "are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public."  (*Id*. at p. 163; see *id.* at pp. 159–164; *Kallen v. Delug* (1984) 157 Cal.App.3d 940, 948–951; *Scolinos v. Kolts* (1995) 37 Cal.App.4th 635, 639–640; *Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 901–903; *McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344–346.)  It follows that an attorney contract that has as its object conduct constituting a violation of the Rules of Professional Conduct is contrary to the public policy of this state and is therefore unenforceable.

10

**B.**

The question Sheppard Mullin raises here is whether a different, more restrictive rule ought to apply when a court considers the lawfulness of a contract on review of an arbitrator's decision, applying the illegality exception recognized in *Loving & Evans*.

The specific question in *Loving & Evans* concerned the validity of an arbitration award granted to a group of unlicensed contractors feuding with a property owner. (*Loving & Evans*, *supra*, 33 Cal.2d at pp. 604–605.) The superior court had confirmed the award without establishing that the contractors had at least substantially complied with the licensing statutes. We held this was error because to enforce the agreement of an unlicensed contractor would violate the public policy codified in statutes forbidding unlicensed persons from engaging in the contracting business and from recovering compensation for such business. (*Id.* at pp. 606–607, 613–614 (plur. opn. of Spence, J.); see *id.* at p. 615 (conc. opn. of Edmonds, J.).)

We acknowledged that the merits of an arbitral award are not generally subject to judicial review, but explained that "the rules which give finality to the arbitrator's determination of ordinary questions of fact or of law are inapplicable where the issue of illegality of the entire transaction is raised in a proceeding for the enforcement of the arbitrator's award." (*Loving & Evans*, *supra*, 33 Cal.2d at p. 609.) Whether a contract is entirely illegal, and therefore unenforceable, is an issue "for judicial determination upon the evidence presented to the trial court, and any preliminary determination of legality by the arbitrator . . . should not be held to be binding upon the trial court." (*Ibid.*) This is because "[t]he question of the validity of the basic contract [is] essentially a judicial question," whether the question is raised in opposition to a petition to compel arbitration or in a postarbitration petition to vacate an arbitral award. (*Id.* at p. 610.) "If this were

11

not the rule," we reasoned, "courts would be compelled to stultify themselves by lending their aid to the enforcement of contracts which have been declared by statute to be illegal and void. A party seeking confirmation cannot be permitted to rely upon the arbitrator's conclusion of legality for the reason that paramount considerations of public policy require that this vital issue be committed to the court's determination whenever judicial aid is sought." (*Id.* at p. 614.)

In the years since *Loving & Evans* was decided, this court has identified limits to this exception to arbitral finality, but the court has not questioned the continued validity of the exception itself.[3] In *Ericksen, Arbuthnot, McCarthy,*

---

[3]    Since *Loving & Evans*, the Courts of Appeal in several cases have applied the illegality exception in declining to confirm arbitration awards based on a judicial determination that the parties' contract violated public policy and was therefore void and unenforceable in its entirety. (*Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 892–893 [whether unlicensed person acted as real estate broker is for court to determine, not arbitrator]; *All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723, 737 [where arbitrator made award to unlicensed person who allegedly acted as a real estate broker in violation of statute, "the issue of illegality is one for judicial determination upon the evidence presented to the trial court"]; *Green v. Mt. Diablo Hospital Dist.* (1989) 207 Cal.App.3d 63, 66, 71–73 [allegations that hospital district's buy-out agreement with executive constituted illegal gift of public funds, illegal payment of extra compensation, etc., constituted claims of illegality voiding entire contract and were subject to judicial determination; trial court properly denied petition to compel arbitration]; *Bianco v. Superior Court* (1968) 265 Cal.App.2d 126, 129–130 [applying rule to claim that oil drilling contract was unenforceable because the parties failed to obtain the required drilling permits; petition to compel arbitration should have been denied]; see also *Epic Medical Management, LLC v. Paquette* (2015) 244 Cal.App.4th 504, 512 [stating rule that "[w]hen it is alleged that the contract *in its entirety* is illegal, the issue is reviewable," but finding rule inapplicable because allegedly illegal transactions were only an incidental part of parties' contractual arrangement]; *Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 36 [in case involving unlicensed person acting as contractor, distinguishing *Loving & Evans* on ground that claim of illegality went to only one provision of broad development agreement]; *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1417, fn. 1 [noting entire-illegality principle but declining to address it in view of lack of illegality].)

*Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312 (*Ericksen*), we considered whether a party is entitled to avoid arbitration pursuant to a contractual arbitration clause when the party alleges it was fraudulently induced to enter into the contract. We answered the question in the negative, concluding that the agreement to arbitrate was severable from the remainder of the contract, and the question of whether the contract (as opposed to the agreement to arbitrate) had been fraudulently induced was thus a matter for the arbitrator to consider in the first instance. (*Id.* at pp. 317–320, citing, inter alia, *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395 [reaching same conclusion in case of alleged fraudulent inducement].) We also considered "the practical consequences of a rule which would allow a party to avoid an arbitration commitment" merely by pleading that the other party never intended to fulfill its contractual obligations. (*Ericksen*, *supra*, at pp. 322–323.) In holding such a fraud claim did not preclude arbitration, we distinguished *Loving & Evans* and other cases in which "the issue of *illegality* of the contract has been raised." (*Ericksen*, at p. 316, fn. 2.) We explained that while "[q]uestions of public policy which are implicated by an illegal agreement . . . might be ill-suited for arbitral determination," the same is not true of "garden-variety 'fraud in the inducement' " claims "related to performance failure." (*Id.* at p. 317, fn. 2.) The latter sort of claims, we explained, are, by contrast, "ideally suited for the arbitrator's expert determination." (*Ibid.*)

Later, in *Moncharsh*, *supra*, 3 Cal.4th 1, we considered whether the claimed illegality of a *provision* of a contract (as opposed to the entirety of the contract) constitutes grounds for vacating an arbitral award. In that case, an attorney and law firm executed an employment agreement that, among other things, provided for the remittance of a substantial percentage of future fees to the law firm if the attorney left and took clients with him. When the attorney did just that, the firm

13

demanded its contractual share, and the attorney refused. The parties submitted the ensuing dispute to an arbitrator in accordance with the arbitration clause of the employment agreement. (*Id.* at pp. 6–7.) In the arbitration proceedings, the attorney argued that the fee sharing clause was unenforceable because it violated the Rules of Professional Conduct and case law on entitlement to fees from a former client, but the arbitrator rejected the argument. The attorney sought judicial review of the merits of that ruling through a petition to vacate or modify the award under Code of Civil Procedure section 1286.2, citing *Loving & Evans* in support of his claim for judicial review. (*Moncharsh*, at pp. 7–8, 31.)

This court rejected the argument. *Loving & Evans*, we emphasized, concerned a claim that the contract was illegal not just in part, but in whole. (*Moncharsh*, *supra*, 3 Cal.4th at pp. 31–32.) The distinction mattered, we explained, because the CAA calls for the enforcement of an arbitration agreement unless there are grounds for revoking that agreement. (*Moncharsh*, at p. 29; see Code Civ. Proc., § 1281.2.) "If a contract includes an arbitration agreement, and grounds exist to revoke *the entire contract*, such grounds would also vitiate the arbitration agreement. Thus, if an otherwise enforceable arbitration agreement is contained in an illegal contract, a party may avoid arbitration altogether." (*Moncharsh*, at p. 29, italics added.)[4] But when, as in *Moncharsh* itself, "the alleged illegality goes to only a portion of the contract (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable." (*Id.* at p. 30.) We accordingly rejected the suggestion that

---

[4] Despite its broad phrasing, *Moncharsh* did not purport to overrule *Ericksen*, *supra*, 35 Cal.3d at pages 316 to 317, footnote 2, 322 to 323, in which we had taken the view that fraudulent inducement in the making of the contract, as distinguished from illegality, is not a ground for vitiating an arbitration agreement contained therein.

14

judicial review of an arbitrator's decision is routinely available in such cases. (*Id.* at p. 32, fn. 14.)

In the portion of *Moncharsh* on which Sheppard Mullin relies most heavily, we went on to observe "that there may be some limited and exceptional circumstances justifying judicial review of an arbitrator's decision when a party claims illegality affects only a portion of the underlying contract. Such cases would include those in which granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights." (*Moncharsh*, *supra*, 3 Cal.4th at p. 32, citing *Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 225–227.) In light of the legislative policy in favor of arbitral finality, however, we counseled that courts should be reluctant to invalidate an award on such a ground "[w]ithout an explicit *legislative* expression of public policy." (*Moncharsh*, at p. 32, italics added.) "Absent a clear expression of illegality or public policy undermining" the statutory presumption favoring private arbitration and the finality of arbitral awards, "an arbitral award should ordinarily stand immune from judicial scrutiny." (*Ibid.*) The particular ethical rules the attorney had cited were inadequate for this purpose, we held, as the rules said nothing to suggest arbitration was inappropriate to resolve what was "essentially an ordinary fee dispute." (*Id*. at p. 33.)

Sheppard Mullin seizes on the reference to an "explicit legislative expression of public policy" in this passage to argue that judicial review of the arbitral award in this case should be limited to whether the parties' agreement violates a statute or comparable declaration of the Legislature. But the language on which Sheppard Mullin relies is not fairly read as a general caution against reliance on nonlegislative expressions of public policy in considering the enforceability of contracts containing arbitration agreements. The passage was concerned with a different subject: when, notwithstanding a valid and enforceable arbitration

15

agreement, an arbitrator's resolution of a particular issue should be subject to judicial review for legal error. The court noted that such review might be warranted when "granting finality to an arbitrator's decision would be inconsistent with the protection of a party's *statutory rights*," but it advised courts to be wary of such claims in the absence of a clear expression of *statutory* policy. (*Moncharsh*, 3 Cal.4th at p. 32, italics added; see also *id.* at p. 33 ["[T]he normal rule of limited judicial review may not be avoided by a claim that a provision of the contract, construed or applied by the arbitrator, is 'illegal,' except in rare cases when according finality to the arbitrator's decision would be incompatible with the protection of a statutory right."].) *Moncharsh* did not suggest, much less hold, that a court presented with a claim that an entire contract or transaction is void for illegality is limited to considering only those expressions of public policy that are contained in legislative enactments.

Sheppard Mullin argues that it makes no sense to distinguish for these purposes between claims of partial contractual illegality and complete illegality; in either case, it argues, the legislative policy favoring contractual arbitration should yield only when the contract violates public policy as the Legislature has declared it. But ever since *Loving & Evans*—whose continued validity Sheppard Mullin has not questioned—California cases have made clear that the legislative policy favoring contractual arbitration, and the finality of arbitral awards, applies only when there is, in fact, a valid contract to arbitrate. (*Loving & Evans*, *supra*, 33 Cal.2d at p. 610.) And as we said in *Moncharsh*, while a claim that a single provision of a contract is illegal ordinarily has no bearing on the validity of the parties' agreement to arbitrate, the same is not true of a claim that the entire contract is void for illegality. In such cases, we have said, the agreement to arbitrate cannot be severed from the remainder, and a court is not bound to

16

confirm the results of an arbitration conducted under such a contract. (*Moncharsh*, *supra*, 3 Cal.4th at p. 29.)

Sheppard Mullin also makes much of the fact that *Loving & Evans* itself concerned a claim of illegality premised on violation of statutory law, and references to the nature of the claim are scattered throughout the opinion. (E.g., *Loving & Evans*, *supra*, 33 Cal.2d at p. 604 [the arbitration award could not "be reconciled with the settled public policy of this state as expressed in our statutory law"]; *id.* at p. 612 [confirming the arbitration award "would be tantamount to giving judicial approval to acts which are declared unlawful by statute"].) Subsequent cases applying the *Loving & Evans* illegality exception have involved similar scenarios. (E.g., *All Points Traders, Inc. v. Barrington Associates*, *supra*, 211 Cal.App.3d at p. 737 [unlicensed person allegedly acted as a real estate broker in violation of statute].)[5] But the logic of these cases is not so limited. As we have since explained, the basic premise of *Loving & Evans* is that an agreement to arbitrate is invalid and unenforceable if it is made as part of a contract that is invalid and unenforceable because it violates public policy. (*Moncharsh*, *supra*, 3 Cal.4th at p. 29; *Loving & Evans*, at p. 610; accord, *Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 917 [notwithstanding general rules of arbitral finality, "judicial review may be warranted when a party claims that an arbitrator has enforced an entire contract or transaction that is illegal"].) And as noted, California law holds that a contract may be held invalid and unenforceable on

---

**5**      *Green v. Mt. Diablo Hospital Dist.*, *supra*, 207 Cal.App.3d at pages 71 to 73, applied the rule to an agreement made in violation of both statutory and constitutional limits on public agencies. The court in *Bianco v. Superior Court*, *supra*, 265 Cal.App.2d at pages 129 to 130, did not specify the source of the law requiring the parties to acquire drilling permits; whether it was a statute or a regulation is thus unclear.

public policy grounds even though the public policy is not enshrined in a legislative enactment.

## C.

Sheppard Mullin warns that failure to adopt a legislative policy limitation will invite a flood of litigation by parties disappointed by arbitration results. Courts will be mired in difficult line-drawing exercises to determine what sort of contracts violate public policy and which do not. The problem will be particularly acute in the context of attorney-service contracts, Sheppard Mullin says, because the Rules of Professional Conduct govern so many aspects of the attorney-client relationship. And to resolve these claims, courts will be regularly called on to resolve highly factual disputes, thereby eliminating the advantages of arbitration.

But by declining to adopt Sheppard Mullin's legislative policy limitation on the illegality exception, we are hardly breaking new ground. We merely affirm that, under *Loving & Evans*, the legality of a contract that contains an arbitration agreement is to be judged by the same standards as a contract without such an agreement. And we repeat that those standards do not encompass claims of mere partial illegality; the case law does not establish, nor do we today hold, that an attorney-services contract may be declared illegal in its entirety simply because it contains a provision that conflicts with an attorney's obligations under the Rules of Professional Conduct. As *Moncharsh* illustrates, the violation of an ethical rule in one portion of a contract (there a fee-splitting provision) does not necessarily preclude enforcement of the contract as a whole. (*Moncharsh*, *supra*, 3 Cal.4th at p. 30; see also Civ. Code, § 1599 [contract with "several distinct objects" may be void as to an unlawful one and valid as to a lawful one]; *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 137–139 [when attorney-service contract was valid as to services performed in New York and invalid as to those performed in California, the valid part would be severed from

18

the remainder, allowing law firm to seek contractual fees for New York work];
*Calvert v. Stoner* (1948) 33 Cal.2d 97, 103–105 [invalid provision in fee
agreement prevented client from settling without lawyer's consent; it was held
severable from the lawful compensation provisions, which remained enforceable].)
It is only when "the illegality taints the entire contract" that courts may declare
"the entire transaction is illegal and unenforceable." (*Keene v. Harling* (1964) 61
Cal.2d 318, 321.)

With this background in mind, we turn to the question whether the claimed
violation in this case constitutes grounds for revocation of the entire contract.

### III.

J-M argues, and the Court of Appeal agreed, that the engagement agreement
at issue is unenforceable because it violated rule 3-310(C)(3) of the Rules of
Professional Conduct (rule 3-310(C)(3)). That rule provides that an attorney
"shall not, without the informed written consent of each client . . . [¶] . . . [¶] . . .
[r]epresent a client in a matter and at the same time in a separate matter accept as a
client a person or entity whose interest in the first matter is adverse to the client in
the first matter." (*Ibid.*) "Simply put," without informed written consent, "an
attorney (and his or her firm) cannot simultaneously represent a client in one
matter while representing another party suing that same client in another matter."
(*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.* (N.D.Cal. 2003)
264 F.Supp.2d 914, 919.) This general prohibition applies even if "the
simultaneous representations may have *nothing* in common." (*Flatt v. Superior
Court* (1994) 9 Cal.4th 275, 284 (*Flatt*).) " 'Informed written consent' " is defined
to mean "written agreement to the representation following written disclosure,"
and "[d]isclosure" is defined as "informing the client . . . of the relevant
circumstances and of the actual and reasonably foreseeable adverse consequences
to the client . . . ." (Rules Prof. Conduct, rule 3-310(A)(2), (1).)

19

Sheppard Mullin does not dispute that its concurrent representation of J-M and South Tahoe came within the scope of rule 3-310(C)(3), but maintains that it obtained J-M's informed consent to that representation by means of the conflict waiver provision of the parties' engagement agreement. We conclude that Sheppard Mullin's concurrent representation of J-M and South Tahoe violated rule 3-310(C)(3) and rendered the engagement agreement between Sheppard Mullin and J-M unenforceable. Our conclusion rests on three subsidiary points: First, at the time Sheppard Mullin agreed to represent J-M in the qui tam action, the law firm also represented a client with conflicting interests, South Tahoe; second, because Sheppard Mullin knew of that conflicting interest and failed to inform J-M of it, J-M's consent was not "informed" within the meaning of the Rules of Professional Conduct; and third, Sheppard Mullin's unconsented-to conflict of interest affected the whole of its engagement agreement with J-M, rendering it unenforceable in its entirety.

## A.

In their engagement agreement, Sheppard Mullin asked J-M to agree to the law firm's representation of any other client, "currently or in the future," in matters not substantially related to its representation of J-M, "even if the interests of the other client are adverse" to J-M's. The conflict waiver clause alerted J-M that Sheppard Mullin is a large firm with many offices and attorneys and may represent clients whose interests conflict with J-M's, but it did not disclose any particular conflict, or even any area of potential conflict, and did not mention Sheppard Mullin's concurrent representation of South Tahoe.

The parties and amici curiae debate at length whether a general advisement of this type is adequate to obtain a client's informed consent to the possibility of future conflicts with a law firm's future clients. But J-M argues that this debate is beside the point, because when it hired Sheppard Mullin to represent it in the qui

20

tam action, the firm's representation of South Tahoe was not merely a future possibility; it was a present reality. Sheppard Mullin disputes the premise, asserting that when the firm took on J-M's representation on March 4, 2010, South Tahoe was a *former* client (or, to borrow a term used at oral argument, a "dormant" client) and did not become a current client again until March 29, when Dinkin began new employment work for the agency. But based on the terms of Sheppard Mullin's engagement agreement with South Tahoe, as well as the undisputed facts concerning their course of dealing, we agree with J-M: Sheppard Mullin and South Tahoe had an attorney-client relationship at the time Sheppard Mullin took on J-M, South Tahoe's adversary, as a client.

South Tahoe's operative engagement agreement, executed in 2006, provided that Sheppard Mullin would represent the utility district "in connection with general employment matters (the 'Matter')." The agreement further provided that South Tahoe could terminate the representation at any time, as could Sheppard Mullin (subject to its ethical obligations), but that otherwise the representation would terminate "upon completion of the Matter" unless the firm agreed to render other legal services to the agency. The parties' agreement thus established an attorney-client relationship that, absent earlier termination by one of the parties, would endure so long as Sheppard Mullin continued to work on "the Matter," which was defined in the agreement as "general employment matters."

Dinkin had performed employment work for South Tahoe in November 2009 and did so again beginning on March 29, 2010. Overall, Dinkin had provided South Tahoe legal services as a Sheppard Mullin partner since 2002, and the firm billed the utility district for 119 hours of work in the five years before May 2011. As of March 4, 2010, then, Sheppard Mullin's work on "general employment matters" was ongoing. There is no evidence either party terminated the engagement until South Tahoe did so in 2011, after it discovered the firm's

21

conflict of interest.  It follows that Sheppard Mullin was still South Tahoe's attorney in March 2010, when it also began representing J-M.

This conclusion finds support in a substantial body of case law from both within and without California.  Under comparable circumstances, where a law firm and client have had a long-term course of business calling for occasional work on discrete assignments, courts have generally held the fact that the firm is not performing any assignment on a particular date and may not have done so for some months—or even years—does not necessarily mean the attorney-client relationship has been terminated.  In *International Business Machines Corp. v. Levin* (3d Cir. 1978) 579 F.2d 271, 281, for example, the court found a continuous attorney-client relationship existing at the time a law firm took on adverse representation even though the law firm "had no specific assignment from IBM on hand on the day the antitrust complaint was filed and even though [the law firm] performed services for IBM on a fee for service basis rather than pursuant to a retainer arrangement."  As the court explained, "the pattern of repeated retainers, both before and after the filing of the complaint, supports the finding of a continuous relationship."  (*Ibid.*; see also, e.g., *M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 616–617 [several-month gap following completion of last assignment did not terminate attorney-client relationship]; *Kabi Pharmacia AB v. Alcon Surgical, Inc.* (D.Del. 1992) 803 F.Supp. 957, 962 [allegedly " 'sporadic' " nature of firm's work, and "lull" in such work at time of adverse representation, does not support finding there was no ongoing attorney-client relationship]; *SWS Financial Fund A v. Salomon Bros. Inc.* (N.D.Ill. 1992) 790 F.Supp. 1392, 1395, 1399 [continuing relationship found where firm had billed client for 214 hours over a 13-month period on a number of discrete projects, the last ending two months before firm began adverse representation]; *Manoir–Electroalloys Corp. v. Amalloy Corp.* (D.N.J. 1989) 711 F.Supp. 188, 193–195 [individual was law

22

firm's current client in 1988, even though firm had last performed work for individual in 1983 to 1984, where the two had a long-standing arrangement involving legal work on a number of matters].)  The central question is whether the client would reasonably understand that the representation has terminated (see Rest.3d Law Governing Lawyers, § 31, com. h, p. 223; *id.*, § 18), and courts are properly reluctant to impose on a client the burden of discerning that a law firm that has done periodic work for it has ceased to be the client's attorney, simply by lapse of time.

Sheppard Mullin contends its agreement with South Tahoe was a "framework" agreement under which the relationship would be renewed, on the same terms, each time the client had a new assignment for the firm—and, critically, one that would end when the assignment was completed.  (See *Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 913 (*Banning Ranch*) [framework agreement between law firm and client created "a structure for establishing future attorney-client relationships on an 'as-requested' basis by the [client], and subject to confirmation by the . . . firm," but " 'did not create an attorney-client relationship absent an actual request, and acceptance, for representation on a particular matter' "].)  The terms of the agreement do not, however, bear out the characterization.  The agreement provided that Sheppard Mullin's representation of South Tahoe would continue for the length of "the Matter," which the agreement defined as general employment *matters*, in the plural.  The definition belies the suggestion that the parties intended to terminate the attorney-client relationship after each individual general employment matter was completed.  And unlike the framework agreement at issue in *Banning Ranch*, the agreement contained no language reserving to the law firm the right to decline work requested by the client.  Nor did the agreement include any other explicit statement that Sheppard Mullin and South Tahoe would maintain an attorney-

client relationship only during times when the law firm was actually performing work for the utility district.

While the South Tahoe engagement agreement was not what the *Banning Ranch* court called a "[c]lassic retainer agreement[]" (*Banning Ranch*, *supra*, 193 Cal.App.4th at p. 917)—there was no retainer fee involved—it was not a simple framework agreement, either. It was, rather, an agreement governing a continuing engagement involving occasional work on employment matters as needed. And under that agreement, over the course of a decade Sheppard Mullin regularly advised and assisted South Tahoe with employment matters. (Cf. *Banning Ranch*, at p. 915 [law firm performed minimal work for client under agreement].) Absent any express agreement severing the relationship during periods of inactivity, South Tahoe could reasonably have believed that it continued to enjoy an attorney-client relationship with its longtime law firm even when no project was ongoing. (See *Manoir–Electroalloys Corp. v. Amalloy Corp.*, *supra*, 711 F.Supp. at p. 194 [client could reasonably "construe [attorney's] actions as the actions of attorneys vis-à-vis their present client"].)

**B.**

As noted, J-M consented to waive current conflicts, as well as future ones. The waiver thus, by its terms, covers the conflict with South Tahoe. We must therefore consider whether the waiver constituted effective consent to Sheppard Mullin's concurrent representation of adverse interests.

The limitations in rule 3-310(C)(3) serve to enforce "the attorney's duty— and the client's legitimate expectation—of *loyalty*, rather than confidentiality." (*Flatt*, *supra*, 9 Cal.4th at p. 284.) It is for this reason that the rules encompass simultaneous representation even in unrelated matters where there is no risk that confidential information will be transmitted. (*Ibid.*) The purpose of these rules, we have explained, "is evident, even (or perhaps especially) to the nonattorney. A

24

client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship." (*Id.* at p. 285; accord, *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1147; *Jeffry v. Pounds* (1977) 67 Cal.App.3d 6, 10–11 (*Jeffry*).)

Because rule 3-310(C)(3) embodies a core aspect of the duty of loyalty, the disclosure required for informed consent to dual representation must also be measured by a standard of loyalty. To be informed, the client's consent to dual representation must be based on disclosure of all material facts the attorney knows and can reveal. (See, e.g., *Image Technical Services, Inc. v. Eastman Kodak Co.* (N.D.Cal. 1993) 820 F.Supp. 1212, 1214–1215, 1217 [law firm failed to obtain informed consent to a conflict of interest because it did not disclose known material details of the conflict].) An attorney or law firm that knowingly withholds material information about a conflict has not earned the confidence and trust the rule is designed to protect.

Assessed by this standard, the conflicts waiver here was inadequate. By asking J-M to waive current conflicts as well as future ones, Sheppard Mullin did put J-M on notice that a current conflict *might* exist. But by failing to disclose to J-M the fact that a current conflict *actually* existed, the law firm failed to disclose to its client all the "relevant circumstances" within its knowledge relating to its representation of J-M. (Rules Prof. Conduct, rule 3-310(A)(1).)

Sheppard Mullin contends the blanket disclosure and waiver was sufficient in light of J-M's size and sophistication and the participation of J-M's own general counsel in the engagement negotiations. It cites a federal disqualification case from Texas, *Galderma Laboratories v. Actavis Mid Atlantic LLC* (N.D.Tex. 2013)

927 F.Supp.2d 390 (*Galderma*), for support. In that case, Galderma, a large corporation with global operations, engaged a law firm to help it with employee benefits matters, signing (by its general counsel) a blanket waiver of conflicts for the law firm. (*Id.* at p. 393.) One of the firm's other clients, Actavis, was later named a defendant in an intellectual property suit brought by Galderma, and the firm represented Actavis in that litigation. When Galderma learned of the law firm's adverse concurrent representation, it sought to disqualify the firm in the intellectual property action. (*Id.* at p. 394.)

The district court denied disqualification. The court applied the American Bar Association Model Rules of Professional Conduct (hereinafter the Model Rules), which require informed consent to concurrent representation of adverse interests (a more lenient Texas rule did not). (*Galderma*, *supra*, 927 F.Supp.2d at pp. 395–396.) Relying on a comment to rule 1.7 of the Model Rules to the effect that a general waiver may be effective where the client is an experienced user of legal services represented by independent counsel, the district court found the law firm's blanket waiver form effective to obtain informed consent from Galderma, a large corporation represented by its own general counsel. (*Id.* at pp. 396–397, 399–406.)[6]

*Galderma* is inapposite. As an initial matter, whether or not the district court in that case correctly interpreted and applied the Model Rules, California has not

---

[6]     Rule 1.7(b)(4) of the Model Rules permits concurrent representation of adverse parties with each client's informed consent, confirmed in writing. Comment 22 to the rule, addressing consent to a future conflict, notes that a "general and open-ended" consent will ordinarily be ineffective but may suffice "if the client is an experienced user of the legal services involved," particularly if the client is independently represented when giving consent.

adopted those rules or, more importantly, the comments to them.**7**  But even more to the point, Sheppard Mullin's blanket waiver would not be effective in this case even under *Galderma*'s approach, because here the law firm failed to disclose a known, existing conflict before soliciting J-M's consent.  On this point, the *Galderma* court was clear:  "If a conflict of interest is known to an attorney at the time he seeks a waiver, the attorney is not allowed to hide that conflict, regardless of whether the client is sophisticated or not." (*Galderma*, *supra*, 927 F.Supp.2d at pp. 402–403.)  We agree.  Whether the client is an individual or a multinational corporation with a large law department, the duty of loyalty demands an attorney or law firm provide the client all material information in the attorney or firm's possession.  No matter how large and sophisticated, a prospective client does not have access to a law firm's list of other clients, and cannot check for itself whether the firm represents adverse parties.  Nor can it evaluate for itself the risk that it may be deprived, via motion for disqualification, of its counsel of choice, as happened here.  In any event, clients should not have to investigate their attorneys.

---

**7**      On May 10, 2018, this court approved comprehensive amendments to the Rules of Professional Conduct, to take effect November 1, 2018.  As part of this revision, current rule 3-310 will be replaced by a new provision governing conflicts of interest involving current clients, rule 1.7, which does take some of its language from rule 1.7 of the Model Rules.  Like the current rule 3-310, new rule 1.7 will require informed written consent for concurrent representation of adverse interests.  But in approving this rule, we did not adopt the comment to rule 1.7(a) of the Model Rules upon which the *Galderma* court relied.  We instead noted that the client's experience and sophistication and the presence of independent representation in connection with the consent are "relevant" to the effectiveness of that consent, and that the new rule "does not preclude an informed written consent[] to a future conflict in compliance with applicable case law."  (Rules Prof. Conduct, rule 1.7, com. 9, eff. Nov. 1, 2018 <http://www.calbar.ca.gov/ Portals/0/documents/rules/New-Rules-of-Professional-Conduct-2018.pdf> [as of Aug. 30, 2018].  All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.)

27

Simply put, withholding available information about a known, existing conflict is not consistent with informed consent.[8]

Because this case concerns the failure to disclose a current conflict, we have no occasion here to decide whether, or under what circumstances, a blanket advance waiver like the one at issue in *Galderma* would be permissible.[9]  We conclude, rather, that without full disclosure of existing conflicts known to the attorney, the client's consent is not informed for purposes of our ethics rules. Sheppard Mullin failed to make such full disclosure here.

## C.

Sheppard Mullin argues that even if it failed to secure adequate consent to the dual representation of J-M in the qui tam action, the ethical violation does not invalidate the entire engagement agreement because the agreement encompassed other matters as well.  But as noted, the object of the agreement was representation in the qui tam action.  The agreement states that Sheppard Mullin is engaged to represent J-M "in connection with the lawsuit filed by Qui Tam plaintiff John

---

[8]	We recognize that client confidentiality may, in some cases, limit what a law firm may tell one client about its representation of another.  As noted in a comment to rule 1.7 of the Model Rules, if one client "refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent."  (Model Rules, rule 1.7, com. 19; see also Rules Prof. Conduct, rule 1.7, com. 7, eff. Nov. 1, 2018 <http://www.calbar.ca.gov/Portals/0/documents/rules/New-Rules-of-Professional-Conduct-2018.pdf> [as of Aug. 30, 2018].)

[9]	Several federal courts applying California law have declined to enforce blanket advance waivers on grounds they insufficiently disclosed the conflicts of interest.  (*Lennar Mare Island, LLC v. Steadfast Ins. Co.* (E.D.Cal. 2015) 105 F.Supp.3d 1100, 1115, 1118; *Western Sugar Coop. v. Archer-Daniels-Midland Co.* (C.D.Cal. 2015) 98 F.Supp.3d 1074, 1083–1084; *Concat LP v. Unilever, PLC* (N.D.Cal. 2004) 350 F.Supp.2d 796, 801, 819–821.)  Because we deal here with disclosure and waiver of a known *existing* conflict, we do not decide whether these decisions are correct.

28

Hendrix." The agreement further states that the representation will terminate upon completion of that action and any related proceedings. The only reference to work outside that scope is a general statement that, except as the parties otherwise agree, the agreement's terms will also apply to "other engagements for [J-M] that [Sheppard Mullin] *may undertake*." (Italics added.) And while the agreement states that certain provisions on responding to possible third party document requests survive termination of the representation, those provisions were not independent of the qui tam representation but dependent on it. They do not change the fact that the agreement was one for representation in the qui tam action, a representation that violated rule 3-310(C)(3).[10]

As explained in part II, *ante*, violation of a Rule of Professional Conduct in the formation of a contract can render the contract unenforceable as against public policy. That is what happened here when Sheppard Mullin agreed to represent J-M in the qui tam action, while also representing South Tahoe on other matters, without obtaining J-M's informed consent. It is true that Sheppard Mullin rendered J-M substantial legal services pursuant to the agreement, and J-M has not endeavored to show that it suffered damages as a result of the law firm's conflict of interest. But the fact remains that the agreement itself is contrary to the public policy of the state. The transaction was entered under terms that undermined an ethical rule designed for the protection of the client as well as for the preservation of public confidence in the legal profession. The contract is for that reason

---

**10** At oral argument, counsel for Sheppard Mullin offered a different argument for treating the conflict as relating only to a portion of the parties' agreement: The agreement encompassed not only representation in the qui tam action, but also representation in a state court action to which South Tahoe was not a party. The engagement agreement itself, however, makes clear that its object was representation in the qui tam action. In any event, Sheppard Mullin did not include this argument or supporting reasoning in its briefs, and we decline to address an argument cursorily raised for the first time at oral argument.

unenforceable.  (See *Chambers*, *supra*, 29 Cal.4th at p. 159 [refusing to enforce fee-sharing agreement reached without client's written consent, even though client was informed of agreement and referring attorney performed substantial legal services]; *Altschul v. Sayble*, *supra*, 83 Cal.App.3d at p. 164 [fee-sharing agreement reached without client's written consent would be void as contrary to public policy even if referring attorney performed some legal services].)

## IV.

Because Sheppard Mullin's ethical breach renders the engagement agreement unenforceable in its entirety, the rule of *Loving & Evans* means that Sheppard Mullin is not entitled to the benefit of the arbitrators' decision awarding it unpaid contractual fees.  The final question before us is whether Sheppard Mullin may receive any compensation for its services at all.

As an alternative to contractual recovery, Sheppard Mullin has sought recovery under the equitable doctrine of quantum meruit—a doctrine that has sometimes been applied to allow attorneys "to recover the reasonable value of their legal services from their clients when their fee agreements are found to be invalid or unenforceable." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 462 (*Huskinson*), citing cases; see Rest.3d Law Governing Lawyers, *supra*, § 39.)[11]  The Court of Appeal, however, held that Sheppard Mullin's conflict of interest disentitles it from either receiving or retaining any compensation for the approximately 10,000 hours it worked on the qui tam matter, even on a theory of quantum meruit.  Relying on a series of California cases in which courts denied

_____

[11]    "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.]  To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.' " (*Huskinson*, *supra*, 32 Cal.4th at p. 458.)

30

compensation in the face of serious ethical breaches, the Court of Appeal held that an attorney may never recover compensation for services rendered while it labored under an improperly waived conflict of interest. (See *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135; *Jeffry*, *supra*, 67 Cal.App.3d 6; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614 (*Goldstein*).)

Sheppard Mullin contends that not every attorney conflict of interest precludes quantum meruit recovery of unpaid fees, much less requires disgorgement of fees already paid. And here, it argues, the circumstances do not warrant the denial of fees. The firm asserts that, as the arbitrators found, its attorneys acted in good faith reliance on the blanket conflict waivers both clients signed. There is no claim that Sheppard Mullin ever worked against J-M's interest in any matter, and no evidence suggests a breach of confidentiality. And finally, Sheppard Mullin emphasizes that J-M stipulated in the arbitration proceedings that it was not challenging the "value or [] quality" of Sheppard Mullin's work on the qui tam action or seeking "transition costs" incurred in replacing the disqualified firm.[12] Under the circumstances, Sheppard Mullin argues, denying all compensation for the extensive legal services the firm rendered in the qui tam action would impose a greatly disproportionate penalty and give J-M a massive windfall.

The ultimate question whether Sheppard Mullin is entitled to any compensation at all is not ripe for our resolution. Because the superior court ordered the matter to arbitration before determining whether the parties had an enforceable contract and refused to review the merits of the arbitral award after it

---

[12] In the stipulation, however, J-M reserved the right to present evidence of the ethical violation and to argue that because of it Sheppard Mullin was not entitled to any fees.

31

was made, it has yet to consider any of the noncontract issues framed by the parties' pleadings.[13] Our holding today will reposition the parties where they were before the case took its unwarranted detour to arbitration, giving them an opportunity to litigate their noncontract claims. In order to clarify the scope of issues remaining for resolution, however, we address the portion of the Court of Appeal's decision categorically barring recovery. We conclude, contrary to the Court of Appeal, that California law does not establish a bright-line rule barring all compensation for services performed subject to an improperly waived conflict of interest, no matter the circumstances surrounding the violation.

Like the Court of Appeal, we begin by considering the rule described in section 37 of the Restatement Third of Law Governing Lawyers: "A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter." (See also *id.*, § 39, com. e, p. 288 [where fee contract is unenforceable, attorney may recover in quantum meruit "unless the lawyer's conduct warrants fee forfeiture under § 37"].) An actual conflict of interest, the Court of Appeal reasoned, is always a serious violation, and so always bars any compensation. But while every violation of attorney conflict of interest rules is indeed serious to some degree, the rule described in the Restatement—which in turn derives from general principles of agency law—is not so categorical. The Restatement instructs, and we agree, that the egregiousness of the attorney's conduct, its potential and actual effect on the client and the attorney-client relationship, and the existence of alternative

---

**13** In its complaint, Sheppard Mullin pleaded a cause of action for quantum meruit; J-M cross-complained for breach of fiduciary duty and fraudulent inducement and prayed for exemplary damages as well as disgorgement of the fees already paid. These claims have not been tried, nor have they been tested by means of a motion for summary judgment.

remedies are all also relevant to whether and to what extent forfeiture of compensation is warranted. (See *id.*, § 37.)

The law takes these case-specific factors into account because forfeiture of compensation is, in the end, an equitable remedy. As California courts have often noted, the rule governing attorney forfeiture derives primarily from the general principle of equity that a fiduciary's breach of trust undermines the value of his or her services. (*Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 14, fn. 2 (*Cal Pak*); *Schaefer v. Berinstein* (1960) 180 Cal.App.2d 107, 135, disapproved on other grounds in *Jefferson v. J.E. French Co.* (1960) 54 Cal.2d 717, 719; accord, *Kidney Association of Oregon v. Ferguson* (1992) 315 Or. 135, 144 [843 P.2d 442] ["When a court reduces or denies attorney fees as a consequence of a lawyer's breach of fiduciary duty, it is a reflection of the limited value that a client receives from the services of an unfaithful lawyer."].) "The remedy of fee forfeiture presupposes that a lawyer's clear and serious violation of a duty to a client destroys or severely impairs the client-lawyer relationship and thereby the justification of the lawyer's claim to compensation." (Rest.3d Law Governing Lawyers, *supra*, § 37, com. b, p. 272.) Forfeiture also serves as a deterrent to misconduct, and it avoids putting clients to the task of proving the harm stemming from the lawyer's conflict of interest when the extent of the harm may be difficult to measure. (*Ibid.*)

The degree to which forfeiture is warranted as an equitable remedy will necessarily vary with the equities of the case. The commentary to the Restatement thus recognizes that while an attorney's "flagrant" breach of his or her duty to a client may justify a complete forfeiture even without proof of harm to the client (Rest.3d Law Governing Lawyers, *supra*, § 37, com. d, p. 273), in other, less egregious cases complete forfeiture "would sometimes be an excessive sanction, giving a windfall to a client" (*id.*, com. b, p. 272). As our sister court has

33

explained, a rule of automatic and complete forfeiture "for every breach of fiduciary duty, or even every serious breach, would deprive the remedy of its equitable nature and would disserve its purpose of protecting relationships of trust." (*Burrow v. Arce* (Tex. 1999) 997 S.W.2d 229, 241; see also *id.* at p. 242, fn. 45 [collecting state cases taking similarly flexible approach].)

When a law firm seeks compensation in quantum meruit for legal services performed under the cloud of an unwaived (or improperly waived) conflict, the firm may, in some circumstances, be able to show that the conduct was not willful, and its departure from ethical rules was not so severe or harmful as to render its legal services of little or no value to the client. Where some value remains, the attorney or law firm may attempt to show what that value is in light of the harm done to the client and to the relationship of trust between attorney and client. Apprised of these facts, the trial court must then exercise its discretion to fashion a remedy that awards the attorney as much, or as little, as equity warrants, while preserving incentives to scrupulously adhere to the Rules of Professional Conduct.

The Court of Appeal decisions on which J-M relies do not persuade us to adopt a more categorical rule. In *Jeffry*, *supra*, 67 Cal.App.3d at pages 8 to 9, a law firm represented a client in a personal injury matter while, through a different attorney, also representing the client's wife against the client in their marital dissolution case, without the client's knowledge or consent. After an unconflicted attorney substituted into the personal injury matter and obtained a recovery for the client, the firm sought and was awarded the reasonable value of its services. (*Ibid.*) On appeal, the client argued that "an attorney should be barred from recovering a fee when the client has discharged him for accepting employment hostile to the client's interests" (*id.* at p. 9) and the appellate court agreed, criticizing the law firm's "uninhibited acceptance of a lawsuit against a current client" (*id.* at p. 11) and denying the firm any compensation for services rendered

34

after its ethical breach (*id.* at p. 12). The court's holding was not surprising, given the facts: the law firm had decided to represent the client's wife in a lawsuit against him, without making any effort to obtain his consent. But the court did not purport to craft a rule to govern all other breaches, nor did it offer any reasoning to support such a categorical rule.

The same is true of *Cal Pak*, *supra*, 52 Cal.App.4th 1, in which the trial court disqualified an attorney and disallowed compensation after he proposed to drop his clients' claims in exchange for several million dollars, to be paid directly to the attorney. (*Id.* at pp. 6–8.) The Court of Appeal ruled that the trial court "clearly did not abuse its discretion," at least insofar as it denied compensation for work performed after this "colossal misdeed." (*Id.* at pp. 16, 13; see also *id.* at p. 13 ["here the trial court faced a direct, acknowledged, undisputed and indefensible betrayal by counsel of the interests of his client and the putative class"].) In so ruling, the court did recite a "general rule in conflict of interest cases that where an attorney violates his or her ethical duties to the client, the attorney is not entitled to a fee for his or her services" (*id.* at p. 14), but it also observed that the same cases point to the possibility of some fees being recoverable in certain circumstances (*id.* at p. 16). The court ultimately upheld the trial court's ruling in pertinent part without relying on any absolute rule denying all compensation for attorneys who act under a conflict of interest, no matter the nature and consequences of the breach.[14]

---

[14] *Day v. Rosenthal* (1985) 170 Cal.App.3d 1125 involved a similarly egregious breach of duty. The attorney there had cheated Doris Day and her husband out of millions of dollars, while ostensibly representing them as attorney and business manager. (*Id.* at pp. 1133–1134.) The case, as the trial court described it, " 'ooze[d] with attorney-client conflicts' " and " 'reek[ed]' " of violations of the Rules of Professional Conduct. (*Id.* at pp. 1134, 1135.) After reviewing the misconduct in detail, the appellate court rejected the attorney's

J-M also relies on *Goldstein*, *supra*, 46 Cal.App.3d 614, in which an attorney had served first as a corporation's general counsel, then as counsel for a corporate director waging a proxy battle for control of the company. The Court of Appeal held the latter representation was subject to a conflict of interest, rendering the contract for that representation unenforceable. (*Id.* at pp. 617, 623–624.) The court went on to conclude, without any supportive reasoning, that the attorney's firm was barred from any noncontractual recovery for his services: "Technically, of course, this action is not brought upon the contract, but is brought for services rendered pursuant to the contract. Needless to say, this distinction does not call for a different result." (*Id.* at p. 624, fn. 11.) *Goldstein*'s unexamined conclusion—needless to say—holds little persuasive value. (Compare Rest.3d Law Governing Lawyers, § 37, *supra*, com. a, p. 271 [noting that even when an attorney's contract is rendered unenforceable by misconduct, the lawyer may in some cases recover the fair value of services rendered].)[15]

---

complaint that the trial court failed to determine the value of his services, explaining that the trial court in fact "found that the reasonable value of all his services was zero" (*id.* at p. 1163) and, in any event, "[h]is conflicts of interest rendered his services valueless and required no finding on the[ir] reasonable value" (*id*. at p. 1162).

[15] The concurring and dissenting opinion (*post*, at p. 11) notes that *Goldstein* and *Jeffry* cited this court's decision in *Clark v. Millsap* (1926) 197 Cal. 765, 785, in which we upheld a trial court's award of only a partial fee "upon a consideration of conflicting evidence which involves the unraveling of transactions intermingled with fictitious and fraudulent acts." We explained that "a court may refuse to allow an attorney any sum as an attorney's fee if his relations with his client are tainted with fraud" or other improper acts " 'inconsistent with the character of the profession.' " (*Ibid.*) Here, the trial court has not yet determined whether Sheppard Mullin's violation of the Rules of Professional Conduct constituted fraud or whether it was in other respects so inconsistent with the character of the legal profession as to justify complete forfeiture of compensation.

Finally, J-M relies on *Fair v. Bakhtiari, supra*, 195 Cal.App.4th 1135 (*Fair*), but *Fair* is not reasonably read to establish a categorical rule barring all recovery in cases of conflict of interest. In *Fair*, the trial court denied quantum meruit recovery to an attorney who had entered into extensive real estate investments with a client without giving the client advisements required by the Rules of Professional Conduct. (*Id.* at pp. 1142–1144, 1146.) On appeal, the court observed that services burdened by a conflict of interest between attorney and client have often been held to be without value. But it explained that " '[w]here the entire contract is prohibited by statute or public policy, recovery in quantum meruit based on the reasonable value of services performed *may* or *may not* be allowed.' " (*Id.* at p. 1150.) The Court of Appeal concluded that the trial court had not abused its discretion in disallowing quantum meruit recovery under the circumstances of the case because the court "could well determine" that the attorney's conduct was "fundamentally at war" with both ethical rules and statutory law and that it "infected the entire relationship" between the attorney and his clients. (*Id.* at p. 1169.)

As *Fair* itself acknowledged, other California cases have explained that quantum meruit recovery may indeed be available in cases of conflict of interest, depending on the circumstances. (*Fair, supra*, 195 Cal.App.4th, at p. 1161.) *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, involved a claim that an attorney who represented both a corporation and individuals with interests adverse to the corporation failed to obtain valid waivers of the conflict and was therefore entitled to no fees for her services to one of the individual clients. (*Id.* at p. 1005.) The appellate court agreed with the individual client that "an attorney's breach of a rule of professional conduct *may* negate an attorney's claim for fees," but noted the absence of any cited case holding that it "automatically" does so. (*Id.* at pp. 1005, 1006, italics added.) On the minimal record the client had provided, the

37

Court of Appeal could not "ascertain if the purported violation of the rules was serious, if any act was inconsistent with the character of the profession, or if there was an irreconcilable conflict" (*id.* at p. 1006), and therefore affirmed the judgment awarding the attorney her fees. (*Id.* at p. 1007; see also *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 279 [affirming trial court's award of compensation in quantum meruit on assumption that attorney violated rule 3-310 of the Rules of Professional Conduct, where asserted ethical violation was not "particularly egregious" and where complaining client had not shown prejudice]; *Sullivan v. Dorsa* (2005) 128 Cal.App.4th 947, 965–966 [whether violation of rules on representation of adverse interests was serious enough to compel forfeiture of fees is a question primarily for the trial court's factfinding and discretionary judgment].)

The Court of Appeal also looked for support to this court's decision in *Huskinson*, *supra*, 32 Cal.4th 453, but *Huskinson* does not mandate application of a categorical bar on compensation in all cases involving the ethical conflicts rules. In *Huskinson*, two law firms violated the Rules of Professional Conduct by agreeing between them to divide the prospective fee in a contingency case without obtaining the client's informed written consent; one firm later sued the other for its agreed share of the fee. (*Id.* at pp. 456–457.) We held that while the plaintiff firm could not recover on the contract, which was unenforceable, it could recover the reasonable value of its services under a claim for quantum meruit. We reasoned that the ethical rule requiring disclosure to the client did not bar either the representation or the receipt of compensation. We further reasoned that allowing a quantum meruit recovery, which would be smaller than the agreed fee division, would not undermine the ethical rule's policy because attorneys would still have a strong incentive to comply in order to receive their full fee. (*Id.* at pp. 459–460, 463.)

38

In the portion of *Huskinson* on which the Court of Appeal relied, we distinguished two cases in which courts had disallowed quantum meruit recovery to attorneys who committed ethical violations, *Jeffry*, *supra*, 67 Cal.App.3d 6, and *Goldstein*, *supra*, 46 Cal.App.3d 614, explaining that those cases "involved violations of a rule that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties." (*Huskinson*, *supra*, 32 Cal.4th at p. 463.) But we had no occasion in *Huskinson* to consider whether an unwaived conflict of interest, standing alone, always requires the denial of compensation. The issue was not presented there and so we did not decide it.[16]

---

**16** The concurring and dissenting opinion (*post*, at pp. 23–24) also invokes *Thomson v. Call* (1985) 38 Cal.3d 633 (*Thomson*), in which a city council member's sale of real estate to the city was found to have violated Government Code section 1090's ban on self-dealing by public employees. We upheld a judgment requiring the defendant to return the entire purchase price, even though the city was permitted to retain the property. (*Thomson*, at pp. 646–652.)

*Thomson* is distinguishable both procedurally and substantively. Whereas the superior court there had held a trial and tailored a remedy appropriate to the facts and equities (*Thomson*, *supra*, 38 Cal.3d at pp. 643–644), here there has been no trial and no such opportunity for the superior court to consider the most appropriate remedy. And while we noted the trial court's remedy in that case was "consistent with a long, clearly established line of cases" denying all recovery for transactions made in violation of Government Code section 1090 (*Thomson*, at p. 647), precedent in the area of attorney rule violations points to a more fact-dependent inquiry into the egregiousness of the attorney's ethical violation, its effect on the value of the work to the client, and other possible injuries to the client. (See, e.g., *Cal Pak*, *supra*, 52 Cal.App.4th at pp. 15–16; Rest.3d Law Governing Lawyers, *supra*, § 37.) The difference between these approaches reflects a difference in the nature of the conflicts at issue—a Government Code section 1090 violation inheres in the very fact of the official's interest in the transaction, and cannot be avoided by full disclosure (*Thomson*, at pp. 649–650)—

39

The Court of Appeal cases demonstrate that forfeiture of compensation is often an appropriate response to conflicted representation. But they do not stand for the proposition that quantum meruit recovery for legal services performed while the attorney suffers from an unwaived conflict of interest is categorically barred, and we do not so hold. We instead hold that the issue is generally one for the discretion of the trial court, to be exercised in light of all the circumstances that gave rise to the conflict. Once again, the Restatement provides useful guidance: "Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." (Rest.3d Law Governing Lawyers, *supra*, § 37; see also *Kidney Association of Oregon v. Ferguson*, *supra*, 843 P.2d at p. 477 [factors to be considered include the value of services to the client and " "whether the breach was intentional, negligent or without fault' "].)

When a law firm seeks fees in quantum meruit that it is unable to recover under the contract because it has breached an ethical duty to its client, the burden of proof on these or other factors lies with the firm. To be entitled to a measure of recovery, the firm must show that the violation was neither willful nor egregious, and it must show that its conduct was not so potentially damaging to the client as to warrant a complete denial of compensation. And before the trial court may award compensation, it must be satisfied that the award does not undermine

as well as a different judgment about the range of remedies that will effectively avoid undermining incentives to comply with the relevant rules (see *id.* at p. 651). Under these circumstances, we conclude consideration of aggravating and mitigating circumstances, such as whether the law firm knowingly violated rule 3-310(C)(3) and whether the conflict affected the value of its legal work, is more appropriate than the "undeniably harsh" categorical rule applied in *Thomson*. (*Thomson*, at p. 650.)

incentives for compliance with the Rules of Professional Conduct. For this reason, at least absent exceptional circumstances, the contractual fee will not serve as an appropriate measure of quantum meruit recovery. (*Huskinson*, *supra*, 32 Cal.4th at p. 458, fn. 2, citing *Chambers*, *supra*, 29 Cal.4th at p. 162.) Although the law firm may be entitled to some compensation for its work, its ethical breach will ordinarily require it to relinquish some or all of the profits for which it negotiated.

On remand, Sheppard Mullin may be unable to meet its burden and the trial court may find its misconduct so egregious or so potentially harmful to J-M as to preclude any award. But without a more robust factual record or any trial court findings we are unable to say it would be an abuse of discretion to order Sheppard Mullin compensated in some degree for the many thousands of hours of legal work it performed on J-M's behalf before South Tahoe successfully moved to have Sheppard Mullin disqualified. Sheppard Mullin's concurrent representation of J-M and South Tahoe in separate matters involved a conflict of interest affecting the representation itself, not merely the attorney's compensation as in *Huskinson*, *supra*, 32 Cal.4th at page 463. But the firm did seek and obtain J-M's written consent to the conflict, albeit through a blanket waiver clause we hold here to be ineffective under the circumstances, and it could properly have represented both clients had the consent been properly informed. (Rule 3-310(C)(3).) The law firm may have been legitimately confused about whether South Tahoe was J-M's current client when it took on J-M's defense, or it may in good faith have believed the engagement agreement's blanket waiver provided J-M with sufficient information about potential conflicts of interest, there being at the time no explicit rule or binding precedent regarding the scope of required disclosure. The conflict was, moreover, not one in which Sheppard Mullin represented another client *against* J-M (compare *Jeffry*, *supra*, 67 Cal.App.3d at p. 11). And although J-M is under no obligation to present evidence that it was injured—the harm resulting

41

from a violation of the duty of loyalty often being intangible and difficult to quantify—at this point, questions as to whether Sheppard Mullin's conflict may have affected the value of its work or led to a loss or default in the qui tam litigation have not yet been litigated.

On the other hand, considering Sheppard Mullin's actions and reasoning in light of the rule set forth in rule 3-310(C)(3), the trial court may conclude that the firm has not shown it was legitimately confused or that it acted in good faith. The law firm may also be unable to show its conduct caused or threatened no harm or only minimal harm to its client. Considering these and other factors, the trial court may determine that the policy of rule 3-310(C)(3) is best vindicated by a complete forfeiture of compensation. On the limited factual record before us, however, we cannot conclude that the existence of an improperly waived conflict of interest, by itself, presents an absolute bar to the award of reasonable compensation for services rendered.

By leaving open the possibility of quantum meruit compensation for the 10,000 hours that Sheppard Mullin worked on J-M's behalf, we in no way condone the practice of failing to inform a client of a known, existing conflict of interest before asking the client to sign a blanket conflicts waiver. Trust and confidence are central to the attorney-client relationship, and maintaining them requires an ethical attorney to display all possible candor in his or her disclosure of circumstances that may affect the client's interests. Sheppard Mullin's failure to exhibit the necessary candor in this case has rendered its contract with J-M unenforceable and has thus disentitled it to the benefit of the unpaid contract fees awarded by the arbitrators in this case. Whether Sheppard Mullin is nevertheless entitled to a measure of compensation for its work is, along with the other unresolved noncontract issues raised by the pleadings, a matter for the trial court to consider in the first instance.

42

## V.

We affirm the judgment of the Court of Appeal insofar as it reversed the superior court's judgment entered on the arbitration award. We reverse the judgment of the Court of Appeal insofar as it ordered disgorgement of all fees collected, and remand for further proceedings consistent with our opinion.

**KRUGER, J.**

**WE CONCUR:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**NARES, J.**\*

---

\*    Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY CHIN, J.**

In March 2010, J-M Manufacturing Company, Inc. (J-M), hired Sheppard, Mullin, Richter & Hampton, LLP (Sheppard Mullin), to provide legal representation in a federal qui tam action in which various public entities were suing J-M for over $1 billion in damages. On the day J-M and Sheppard Mullin signed the engagement agreement, Sheppard Mullin knew, but failed to disclose, that one of the public entities suing J-M in the qui tam action — South Tahoe Public Utility District (South Tahoe) — was an existing client of the law firm. Nor did Sheppard Mullin disclose this fact during the next year of the qui tam litigation, although it actively represented South Tahoe in unrelated matters during that time. It finally disclosed the conflict to J-M in April 2011, only after learning that South Tahoe, which discovered the conflict on its own, was planning to move for Sheppard Mullin's disqualification in the qui tam action. I agree with the majority that the conflict rendered the engagement agreement, including its arbitration clause, unenforceable as against public policy. However, I disagree with the majority that, notwithstanding the conflict and the agreement's invalidity, Sheppard Mullin may be entitled to recover from J-M in quantum meruit for the value of the legal services it provided in the qui tam action. I would instead hold that Sheppard Mullin's failure to disclose its known conflict of interest precludes it from any recovery. I dissent insofar as the majority holds otherwise.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006, J-M, a pipe manufacturer, was sued in a federal court qui tam action regarding pipe it sold to 200 public entities, including South Tahoe. The complaint demanded over $1 billion in damages. On February 5, 2010, South Tahoe intervened in the action.

On February 22, 2010, representatives of J-M — including its general counsel, Camilla Eng — met with Sheppard Mullin attorneys Bryan Daly and Charles Kreindler about taking over as J-M's defense counsel in the qui tam action. On March 4, 2010, Sheppard Mullin and J-M signed an engagement agreement, which included the following general conflict waiver provision: "Sheppard . . . has many attorneys and multiple offices. We may currently or in the future represent one or more other clients (including current, former, and future clients) in matters involving [J-M]. We undertake this engagement on the condition that we may represent another client in a matter in which we do not represent [J-M], even if the interests of the other client are adverse to [J-M] (including appearance on behalf of another client adverse to [J-M] in litigation or arbitration) and can also, if necessary, examine or cross-examine [J-M] personnel on behalf of that other client in such proceedings or in other proceedings to which [J-M] is not a party *provided* the other matter is not substantially related to our representation of [J-M] and in the course of representing [J-M] we have not obtained confidential information of [J-M] material to representation of the other client. By consenting to this arrangement, [J-M] is waiving our obligation of loyalty to it so long as we maintain confidentiality and adhere to the foregoing limitations. We seek this consent to allow our Firm to meet the needs of existing and future clients, to remain available to those other clients and to render legal services with vigor and competence. Also, if an attorney does not continue an engagement or must withdraw therefrom, the client may incur delay, prejudice or additional cost such as acquainting new counsel with the matter."

According to its general counsel, D. Ronald Ryland, before execution of the agreement, Sheppard Mullin ran "a conflicts check" and "identified South Tahoe . . . as a client in matters wholly unrelated to J-M." Specifically, Sheppard Mullin attorney Jeffrey Dinkin had periodically represented South Tahoe on employment matters since at least 2002, and most recently in November 2009. Ryland concluded that "the matters Sheppard Mullin handled for South Tahoe were not 'substantially related' to the Qui Tam Action," and that an "advance conflict waiver" South Tahoe had signed in 2006 — similar to the one J-M signed — therefore "authorized the undertaking of the representation." In Ryland's opinion, because South Tahoe had signed the advance waiver and J-M "was comfortable with, agreed to, and was prepared to sign" a similar waiver, "there was nothing to disclose to J-M" and he informed Daly and Kreindler that they could "agree to represent J-M in the Qui Tam Action." Daly agreed that, because of South Tahoe's advance conflict waiver, "there was no conflict" and that South Tahoe "presented [no] issue regarding representing J-M in the Qui Tam action."

Consistent with this view, before J-M executed the engagement agreement, Sheppard Mullin did not disclose its representation of South Tahoe. Indeed, according to the sworn declaration of Eng, who retained Sheppard Mullin on J-M's behalf, "[d]uring the interview process leading to [Sheppard Mullin's] retention, [Sheppard Mullin] attorneys assured [her] there were no conflicts with the firm's proposed representation in the [qui tam] Action." Sheppard Mullin has not denied this assertion. Daly stated in a sworn declaration that he did not "intentionally conceal[] an alleged conflict" from J-M. But, as noted above, he also declared that "there was no conflict" and that South Tahoe "presented [no] issue regarding representing J-M in the Qui Tam action." Kreindler stated in a sworn declaration only that he "did not learn about any potential issue involving South Tahoe" at the time of the retention, adding that Daly "handled the tasks associated with J-M's retention of Sheppard Mullin," including "running and

evaluating the conflicts check." Ryland stated in a sworn declaration that he "did not 'conceal' anything from J-M nor anyone else in connection with [Sheppard Mullin's] retention by J-M." But, as noted above, he also declared that "there was nothing to disclose to J-M." Sheppard Mullin's view that there was no conflict and nothing to disclose is completely consistent with Eng's statement that Sheppard Mullin attorneys "assured" her "[d]uring the interview process" that "there were no conflicts with the firm's proposed representation in the [qui tam] Action."[1]

A few weeks after the engagement agreement's execution, Dinkin again began actively working for South Tahoe. During the next year, he billed it for about 12 hours of work. Sheppard Mullin did not disclose this fact either to J-M or to South Tahoe's counsel in the qui tam action. In January 2011, South Tahoe's qui tam counsel became aware that Sheppard Mullin was simultaneously representing J-M in the qui tam action and South Tahoe in other matters. In a letter dated March 4, 2011, asking Sheppard Mullin to explain the situation, South Tahoe's counsel stated that it had learned that Sheppard Mullin "concurrently has represented" South Tahoe "for the entire time Sheppard Mullin has been adverse to South Tahoe in the [qui tam] action," and that Sheppard Mullin's "ongoing representation of South Tahoe predate[d] Sheppard Mullin's representation of" J-M "by several years." In response, Kreindler did not deny these assertions, and instead acknowledged that Sheppard Mullin "has been representing South Tahoe for many years in connection with general employment matters." He also cited the "conflict waiver" in the "current engagement letter" with South Tahoe, and stated that, "in response to" South Tahoe's March 4 letter, "an ethical wall," though "not required," had been "erected between" Sheppard Mullin employees "who may be

---

[1] Consistent with this analysis, although Sheppard Mullin's reply brief offers circumstantial reasons for disbelieving Eng's statement, it conspicuously fails to cite anything in the record — including the many declarations its attorneys filed in this case — to refute Eng's statement.

involved with the representation of J-M, and those who may be involved with general employment matters with South Tahoe." Unsatisfied with the response, on April 11, 2011, South Tahoe's counsel informed Sheppard Mullin that South Tahoe was "contemplating" filing a motion to disqualify Sheppard Mullin from the qui tam case, and asked for a "meet and confer discussion" regarding the motion. During a subsequent telephone conference on April 19, South Tahoe's counsel reiterated its intention to move for Sheppard Mullin's disqualification as J-M's counsel.[2]

Between March 4, when South Tahoe's counsel first wrote to Sheppard Mullin about the conflict, and the April 19 telephone conference, Sheppard Mullin did not inform J-M that South Tahoe was questioning Sheppard Mullin's representation of J-M based on a conflict of interest, or that Sheppard Mullin was communicating with South Tahoe's counsel on this issue. It finally did so on April 20, informing Eng by email that South Tahoe's counsel "has threatened to file a motion to disqualify Sheppard Mullin because a lawyer in our Santa Barbara office gives employment advice to South Tahoe." Even then, Sheppard Mullin did not disclose its March 2010 pre-engagement conflicts check. Eng did not discover that information for another two months, when Ryland filed with the court a declaration discussing the issue.

On May 9, 2011, South Tahoe's counsel moved to disqualify Sheppard Mullin as J-M's counsel. Sheppard Mullin opposed the motion based on South

---

[2] According to South Tahoe's attorney, Kreindler stated during the April 19 telephone conference that Sheppard Mullin "had run a conflict check prior to accepting the engagement with J-M," and it "showed South Tahoe to be an existing client." Kreindler maintains he "did not refer to South Tahoe as an 'existing' client," but explained that Sheppard Mullin "had done some labor work for South Tahoe that had concluded by November 2009" and "had done some very modest additional labor work for South Tahoe since [Sheppard Mullin] had become involved in the Qui Tam Action."

Tahoe's execution of the advance conflict waiver. In letters offering to settle the dispute — which proposed a $250,000 cash payment and 40 hours of free employment related legal work in exchange for South Tahoe's conflict waiver — Sheppard Mullin referenced its "long-standing relationship" with South Tahoe, noting that it had "been pleased to provide labor advice to [South Tahoe] for the last 9 years." The court ultimately granted the motion, finding that the advance waiver was insufficient and that Sheppard Mullin's representation therefore violated rule 3-310(C)(3) of the Rules of Professional Conduct,[3] which provides that an attorney "shall not, without the informed written consent of each client . . . [¶] . . . [¶] . . . [r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."

Sheppard Mullin sued J-M for unpaid fees, asserting it was still owed $1 million of the $3 million it had billed (for about 10,000 hours of work). J-M filed a cross-complaint asserting various claims and requesting disgorgement of fees paid and exemplary damages.

Sheppard moved to compel arbitration under the engagement agreement's arbitration provision. The court granted the motion, rejecting J-M's claim that Sheppard Mullin's ethical violation rendered the entire agreement, including the arbitration clause, illegal and unenforceable. The arbitrators subsequently found for Sheppard Mullin, reasoning that any ethical violation was not so serious or egregious as to warrant forfeiture and disgorgement of fees. They awarded Sheppard Mullin over $1.3 million in fees and interest. On Sheppard Mullin's motion, the superior court confirmed the award, rejecting J-M's renewed claim that the agreement was illegal and unenforceable due to the rules violation.

---

[3] All further unlabeled rule references are to the Rules of Professional Conduct.

6

The Court of Appeal reversed, holding: (1) the parties agreed that California law would govern any disputes; (2) under California law, a claim that a contract is wholly illegal and unenforceable is for a court to decide, notwithstanding an arbitration clause; (3) Sheppard Mullin violated rule 3-310(C)(3); and (4) the violation rendered the engagement agreement unenforceable and precluded Sheppard Mullin from recovering any fees, even in quantum meruit.

## DISCUSSION

Initially, I agree with the majority in the following respects: (1) where California law governs, a court may invalidate an arbitration award on the ground that the contract containing the parties' arbitration agreement violates the public policy of the state as expressed in the Rules of Professional Conduct; (2) when Sheppard Mullin and J-M signed the engagement agreement regarding the qui tam action, Sheppard Mullin had an existing attorney-client relationship with South Tahoe on unrelated matters; (3) Sheppard Mullin knew of this existing conflict but failed to disclose it to J-M; (4) because of the nondisclosure, the waiver J-M signed was insufficient to permit Sheppard Mullin to represent J-M notwithstanding the existing conflict; (5) the undisclosed conflict violated rule 3-310(C)(3) and renders the engagement agreement unenforceable in its entirety; and (6) because the engagement agreement is unenforceable in its entirety, Sheppard Mullin is not entitled to the benefit of the arbitrators' decision awarding it unpaid contractual fees.

However, I disagree with the majority's holding that Sheppard Mullin may pursue recovery in quantum meruit for the value of the services it rendered to J-M. Unlike the majority, which "begin[s] by considering" the Restatement Third of the Law Governing Lawyers (maj. opn., *ante*, at p. 32), I begin with our own precedent — *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 462 (*Huskinson*) — which the majority curiously discusses only as a brief afterthought at the end of its opinion (maj. opn., *ante*, at pp. 38-39). *Huskinson* involved a fee

7

dispute, not between a lawyer and client, but between two law firms that had entered into a fee-sharing agreement without complying with the ethical rule requiring them to obtain the client's informed written consent to the agreement. (*Huskinson*, at p. 456.) We held that, although the ethical violation precluded the agreement's enforcement, the plaintiff law firm was entitled to quantum meruit recovery from the defendant law firm for the reasonable value of the legal services it provided to the client. (*Ibid.*) In reaching this conclusion, "we look[ed] first" to whether a quantum meruit award would be contrary to what the violated rule "seeks to accomplish," i.e., prohibiting attorneys from dividing " 'a fee for legal services' " absent the client's informed consent. (*Id.* at p. 458.) We held that it would not, reasoning that the violated rule "does not purport to restrict attorney compensation on any basis other than a division of fees" (*ibid.*) and that an award "based on the reasonable value of" (*id.* at p. 459) legal services neither "constitute[s] a division of fees within the rule's contemplation" nor is "otherwise tied to the specific legal fees [the client] paid" (*ibid.*).

We also considered in *Huskinson* whether permitting quantum meruit recovery as between law firms would be "consistent with case law holding or otherwise recognizing that attorneys may recover from their clients the reasonable value of their legal services when their fee contracts or compensation agreements are found to be invalid or unenforceable for other reasons." (*Huskinson*, *supra*, 32 Cal.4th at p. 461.) We concluded that it would. (*Ibid.*) Notably, in reaching this conclusion, we distinguished two decisions — *Jeffry v. Pounds* (1977) 67 Cal.App.3d 6 (*Jeffry*), and *Goldstein v. Lees* (1975) 46 Cal.App.3d 614 (*Goldstein*) — in which courts *disallowed any quantum meruit recovery* for an ethical rule violation. "Those cases," we explained, "involved violations of a rule that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties." (*Huskinson*, at p. 463.) By contrast,

8

we reasoned, the violated fee-sharing rule at issue in *Huskinson* did "not bar the services plaintiff rendered on [the client's] behalf; it simply prohibit[ed] the dividing of [the client's] fees because she was not provided written disclosure of the fee-sharing agreement and her written consent was not obtained." (*Ibid.*)

Another factor we considered in *Huskinson* was whether "[t]he Legislature's regulation of fee agreements between attorneys and clients favor[ed] the availability of quantum meruit recovery." (*Huskinson*, *supra*, 32 Cal.4th at p. 460.) We concluded that it did, explaining that the Legislature, in several statutes rendering attorney-client fee agreements voidable absent a signed agreement, had specified that if the client voided an agreement for noncompliance, the attorney was " 'entitled to collect a reasonable fee.' " (*Ibid.*, quoting Bus. & Prof. Code, §§ 6147, subd. (b), 6148, subd. (c).) "Allowing quantum meruit recovery when two law firms negotiate a fee-sharing agreement without complying with [the ethics rule's] written client consent requirement is consistent with the Legislature's policy determination that, even if a particular fee or compensation agreement is not in writing or signed by the client, a law firm laboring under such an agreement nonetheless deserves reasonable compensation for its services." (*Huskinson*, at p. 460.)

Finally, we considered in *Huskinson* whether allowing recovery in quantum meruit would "undermine" or "discourage compliance with" the violated rule. (*Huskinson*, *supra*, 32 Cal.4th at pp. 459, 460.) We concluded it would not, explaining: "Attorneys who negotiate contingent fee-sharing agreements, which take into account the risk that the client pays no fee if the client does not prevail in his or her case, understandably prefer to receive their negotiated fees rather than the typically lesser amounts representing the reasonable value of the work performed. Consequently, even if quantum meruit recovery is available when the absence of client notification or consent renders a fee-sharing agreement unenforceable, such attorneys have no less incentive to comply with rule 2–200." (*Id.* at p. 460.)

9

Applying the approach and the factors we set forth in *Huskinson*, I conclude that quantum meruit recovery is unavailable in this case. The answer to the "first" question we considered in *Huskinson* — whether a quantum meruit award would be contrary to what the violated rule "seeks to accomplish" (*Huskinson*, *supra*, 32 Cal.4th at p. 458) — is clearly yes. As here relevant, the purpose of rule 3-310 is to preclude attorneys from simultaneously representing clients with conflicting interests absent the clients' informed written consent. Because Sheppard Mullin did not get that consent, a quantum meruit award would compensate it for legal services that the rule expressly precluded it from providing. Indeed, the majority agrees that the conflict resulting from Sheppard Mullin's concurrent representation of J-M and South Tahoe "*affect[ed] the representation itself*, not merely the attorney's compensation as in *Huskinson*." (Maj. opn., *ante*, at p. 41, first italics added.)

As to whether permitting quantum meruit recovery here would be "consistent with case law" (*Huskinson*, *supra*, 32 Cal.4th at p. 461), based on the very case law we discussed in *Huskinson* — as well as other case law — I conclude that the answer is no. As discussed above, in reaching our conclusion in *Huskinson*, we distinguished *Jeffry* and *Goldstein* — which disallowed any quantum meruit recovery for an ethical rule violation — on the basis that those decisions "involved violations of a rule that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties." (*Huskinson*, at p. 463.) The case now before us fits *precisely within that description*: It involves violation of a rule "that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties." (*Ibid.*) Again, as the majority explains, the conflict resulting from Sheppard

10

Mullin's concurrent representation of J-M and South Tahoe "*affect[ed] the representation itself*, not merely the attorney's compensation as in *Huskinson*." (Maj. opn., *ante*, at p. 41, first italics added.)

The majority declares *Jeffry* and *Goldstein* to be unpersuasive. (Maj. opn., *ante*, at pp. 34-36.) *Jeffry*'s holding, the majority states, "was not surprising" in light of the facts — "the law firm had decided to represent the client's wife in a lawsuit against him, without making any effort to obtain his consent" — "[b]ut the court did not purport to craft a rule to govern all other breaches, nor did it offer any reasoning to support such a categorical rule." (Maj. opn., *ante*, at p. 35) Nor, the majority asserts, did *Goldstein* offer any "supportive reasoning" for its conclusion that noncontractual recovery was unavailable. (Maj. opn., *ante*, at p. 36.)

For several reasons, I disagree with the majority's analysis. First, the majority's description of the facts in *Jeffry* is somewhat misleading. The "law firm" there did not decide to represent the wife of its existing client in their marital dissolution action. (Maj. opn., *ante*, at p. 34.) One attorney in the firm undertook to represent the client's wife in the dissolution action "without the knowledge of" a different attorney who was representing the existing client in a personal injury action "and without knowledge of the status of the personal injury litigation." (*Jeffry*, *supra*, 67 Cal.App.3d at p. 8.) Indeed, the court remarked that it was "not charg[ing] [the attorneys] with dishonest purpose or deliberately unethical conduct." (*Id.* at p. 11.) Here, of course, when Sheppard Mullin undertook to represent J-M, it *did* know — because it ran a conflicts check — of the existing conflict, but made a decision not to disclose it. Second, I disagree that neither *Jeffry* nor *Goldstein* offers reasoning to support denying recovery in this case. Both decisions relied on our statement in *Clark v. Millsap* (1926) 197 Cal. 765 (*Clark*), that " 'acts of impropriety inconsistent with the character of the [legal] profession, and incompatible with the faithful discharge of its duties' " "will prevent [an attorney] from recovering for services rendered." (*Id.* at p. 785; see

11

*Jeffry*, at p. 9; *Goldstein*, *supra*, 46 Cal.App.3d at p. 618.) In my view, knowingly representing clients with conflicting interests, without disclosing the conflict to either client and obtaining the clients' written consent to the simultaneous representation, *is* an " 'act[] of impropriety inconsistent with the character of the [legal] profession, and incompatible with the faithful discharge of its duties.' " (*Clark*, at p. 785.) Indeed, this is precisely how the appellate courts in *Jeffry* and *Goldstein* applied *Clark*'s statement.**4**

The key to understanding this application of *Clark* is the fact that Sheppard Mullin's simultaneous and undisclosed representation of South Tahoe and J-M violated "the most fundamental of all duties" that a lawyer owes a client: the "duty of loyalty." (*State Compensation Insurance Fund v. Drobot* (C.D.Cal. 2016) 192 F.Supp.3d 1080, 1084 (*Drobot*).) As we have explained, "[t]he primary value at stake in cases of simultaneous or dual representation" — even with respect to unrelated matters — "is the attorney's duty — and the client's legitimate expectation — *of loyalty*." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284 (*Flatt*).) This "inviolate" duty (*id.* at p. 288) is a "fundamental value of our legal system" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1146 (*SpeeDee*)). "The effective

---

**4**     The majority's statement that in *Clark* "we upheld a trial court's award of only a partial fee" (maj. opn., *ante*, at p. 36, fn. 12) is both inaccurate and misleading. It is inaccurate because the fee the trial court awarded in *Clark* — $7,500 — was not a "partial" fee (maj. opn., *ante*, at p. 36, fn. 12); it was the *total* fee that, according to the plaintiff, the parties had agreed upon (*Clark*, *supra*, 197 Cal. at p. 775). In agreeing with the plaintiff and awarding this amount "in full for all services performed" (*id.* at p. 785), the trial court rejected the attorney's contention that a $20,000 promissory note the plaintiff had signed represented "the fee that [the attorney] was to receive for professional services," and the court additionally "refused to allow [the attorney] any credit on account of said note on the ground that its execution was fraudulently procured and was without consideration" (*id.* at p. 775). The majority's statement is misleading because we upheld the $7,500 award notwithstanding the attorney's fraudulent acts because the plaintiff in *Clark* "did not object to the allowance of" that sum. (*Id.* at p. 785.) Here, of course, J-M *does* object to the award of *any* compensation.

functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel." (*SpeeDee*, at p. 1146.) "A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship. All legal technicalities aside, few if any clients would be willing to suffer the prospect of their attorney continuing to represent them under such circumstances." (*Flatt*, at p. 285.) But an attorney's "duty to maintain undivided loyalty" is vital, not just in protecting *the client's* trust and confidence in his or her attorney, but more broadly in maintaining "public confidence in the legal profession and the judicial process." (*SpeeDee*, at p. 1146; see *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 547, fn. 6 ["rationale for" the rule prohibiting attorneys, without consent, from accepting employment adverse to a client even in unrelated matters is "the maintenance of the attorney's 'duty of undivided loyalty,' without which ' "public confidence in the legal profession and the judicial process" is undermined' "].) For these reasons, "in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one" (*Flatt*, at p. 284), "regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other" (*SpeeDee*, at p. 1147.) This rule, which is "analogous to the biblical injunction against 'serving two masters' " (*Flatt*, at p. 286), "protect[s] clients' legitimate expectations of loyalty [in order] to preserve this essential basis for trust and security in the attorney-client relationship" (*SpeeDee*, at p. 1147).

Of course, because "[t]he principle of loyalty is for the *client's* benefit," an attorney may simultaneously represent clients "whose interests are adverse as to unrelated matters *provided full disclosure is made and both agree in writing to waive the conflict*." (*Flatt*, *supra*, 9 Cal.4th at p. 285, fn. 4, second italics added.)

However, given the vital and fundamental role of the duty of loyalty in our legal system — including maintaining "public confidence in the legal profession and the judicial process" (*SpeeDee*, *supra*, 20 Cal.4th at p. 1146) — where, as here, full disclosure is not made and informed consent is not obtained, knowingly representing clients with conflicting interests constitutes an " 'act[] of impropriety inconsistent with the character of the [legal] profession, and incompatible with the faithful discharge of its duties,' " so as to " 'prevent [the attorney] from recovering for services rendered.' " (*Clark*, *supra*, 197 Cal. at p. 785.) The majority fails to explain how it concludes otherwise.

Finally, the majority's treatment of *Jeffry* and *Goldstein* is difficult to square with our treatment of those decisions in *Huskinson*. There, we could have limited and criticized *Jeffry* and *Goldstein* as the majority attempts to do so here. Instead, we attributed their denial of quantum meruit recovery to a common factor that was absent in decisions that allowed quantum meruit recovery: "violations of a rule that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties." (*Huskinson*, *supra*, 32 Cal.4th at p. 463.) It is of course true, as the majority asserts, that "we did not decide" in *Huskinson* that an unwaived conflict of interest, standing alone, always requires the denial of compensation. (Maj. opn., *ante*, at p. 39.) Had we done so, the present case would surely not be before us. However, our discussion in *Huskinson* of *Jeffry* and *Goldstein* was important to our analysis, and the majority errs by cavalierly casting it aside simply because the issue now before us "was not presented" in that case. (Maj. opn., *ante*, at p. 39.) The majority's summary treatment of our discussion ignores the fact that our description in *Huskinson* of the common factor that explained the denial of all recovery in *Jeffry* and *Goldstein* — "violations of a rule that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in

14

conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties" (*Huskinson*, at p. 463) — is completely in line with the starting point of our analysis in *Huskinson*: whether a quantum meruit award would be contrary to what the violated rule "seeks to accomplish." (*Id.* at p. 458.)

Notably, our appellate courts have read *Huskinson* precisely as I do. In *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1141, an attorney violated the Rules of Professional Conduct by entering into business relationships with clients without complying with written disclosure and consent requirements. The trial court concluded that the violation precluded the attorney from recovering the reasonable value of the services he had provided, even though the transaction had been "very successful." (*Ibid.*) In affirming, the Court of Appeal relied heavily on *Huskinson*, explaining: "[W]e read *Huskinson* . . . as recognizing a distinction between the type of violations that may render an agreement voidable, but still allow the attorney compensation for the reasonable value of his or her services, and the type of violation that precludes such recovery: Attorneys who violate a rule of professional conduct *may* recover in quantum meruit where they do not act in violation of an express statutory prohibition when providing legal services and where the subject services are not otherwise prohibited. [Citation.] On the other hand, violation of a rule that constitutes a serious breach of fiduciary duty, *such as a conflict of interest that goes to the heart of the attorney-client relationship*, warrants denial of quantum meruit recovery." (*Fair*, at p. 1161, second italics added.)

Still other California case law supports the conclusion that Sheppard Mullin's ethical violation precludes it from seeking quantum meruit recovery. In *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1075, a law firm pursuing a collection matter against a former client was disqualified under rule 3-310(E) because it failed to obtain the former client's informed written consent to the conflicting representation. The law firm's client

15

in the collection matter sued for a declaration that, because of the disqualification, it owed the law firm nothing for its legal services. (*A.I. Credit Corp.*, at p. 1076.) The law firm filed an answer raising the defense of quantum meruit. (*Ibid.*) The trial court granted summary judgment to the client, ruling that the law firm was not entitled to compensation. (*Ibid.*) The Court of Appeal affirmed, citing "[t]he general rule . . . that an attorney disqualified for violating an ethical obligation is not entitled to fees." (*Id.* at p. 1079.) The court rejected the law firm's argument that recovery should be allowed because it had committed only "a minor technical [rules] violation . . . due to its failure to obtain a waiver," explaining: "The trial court determined that there was a disqualifying violation of ethical obligations. Consequently, . . . there is no genuine issue of material fact in this regard precluding summary judgment." (*Ibid.*)

By contrast, none of the case law the majority cites truly supports its conclusion that Sheppard Mullin may be entitled to quantum meruit recovery in this case. The majority principally relies on *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000 (*Pringle*) (maj. opn., *ante*, at p. 37), but that case did not even involve quantum meruit recovery or a proven violation of the ethical rules; it involved recovery *on the contract itself* based on a jury finding of *no ethical violation*. In *Pringle*, an attorney who had simultaneously represented a corporation, its president, and its CEO as codefendants in a harassment action filed a complaint seeking money owed "pursuant to written fee agreements." (*Pringle*, at p. 1002.) One of the agreements contained a lengthy discussion of the potential conflicts of interest arising from an attorney's simultaneous representation of multiple parties and advised the defendants to consult with independent counsel before signing a waiver. (*Ibid.*) The CEO executed the waiver and agreement on his own behalf and on behalf of the corporation. (*Id.* at p. 1003.) On this record, the jury "returned a general verdict" for the attorney, finding in a special verdict that the CEO "had given informed written consent to allow [the attorney] to represent more than one client." (*Ibid.*) In seeking to overturn the verdict on

16

appeal, the CEO asserted that the attorney had violated the ethical rule requiring a corporation's conflict waiver to be signed by someone who is not also being individually represented by the same attorney. (*Id.* at p. 1005.) The appellate court affirmed the jury's verdict, stating: "We have no evidence [in the record before us] which would enable us to ascertain if there was conflicting evidence on whether [the attorney] violated the Rules of Professional Conduct. We do not know if the corporation, in some way other than the two fee agreements, consented to the representation." (*Ibid.*) In short, there was no *proven* rule violation in *Pringle*, and no attempt to recover in quantum meruit.

In dictum, the court in *Pringle* went on to discuss the CEO's argument that "an attorney's breach of a rule of professional conduct may negate an attorney's claim for fees." (*Pringle*, *supra*, 73 Cal.App.4th at p. 1005.) The court observed that the CEO had "not cited a case standing for the proposition that a violation of a rule of professional conduct automatically precludes an attorney from obtaining fees." (*Id.* at pp. 1005-1006.) Of course, the issue here is not whether *any* violation of *any* of the Rules of Professional Conduct automatically precludes recovery. Certainly, *Huskinson* refutes that proposition. The issue here is whether such recovery is barred by the violation of one particular rule — the rule that absolutely precludes attorneys from simultaneously representing clients with conflicting interests absent full disclosure of the conflict and consent, in order to preserve "the most fundamental of all duties a lawyer owes a client": the duty of loyalty. (*Drobot*, *supra*, 192 F.Supp.3d at p. 1084.) The *Pringle* court also noted that the simultaneous representation presented a "potential" conflict of interest, that it did "not know if the interests of [the CEO] and [the corporation actually] diverged," and that it therefore could not "ascertain if the purported rule violation by [the attorney] was incompatible with the faithful discharge of her duties." (*Pringle*, at pp. 1006, 1007.) Here, of course, there was an *actual* conflict of interest, because one of Sheppard Mullin's existing clients was suing another of its existing clients. Thus, as explained above, we *can* "ascertain" that Sheppard

17

Mullin's *proven* rule violation "was incompatible with the faithful discharge of [its] duties." (*Id.* at p. 1007.) For these reasons, *Pringle* does not support the majority's view that Sheppard Mullin may pursue quantum meruit recovery notwithstanding its violation of rule 3-310.

For many similar reasons — and some additional ones — nor does *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257 (*Mardirossian*), which the majority also cites. (Maj. opn., *ante*, at p. 38.) In *Mardirossian*, a law firm that had filed an action on behalf of two clients — Ersoff and Leonard — was fired by Ersoff shortly before he settled his claim. (*Mardirossian*, at pp. 261-263.) Thus, like *Pringle*, it involved counsel that was simultaneously representing several clients *on the same side in a single a case*. Also like *Pringle*, *Mardirossian* involved, not an actual conflict of interest, but "at most, a potential conflict of interest between" the simultaneously represented clients. (*Mardirossian*, at p. 264.) As in *Pringle*, in *Mardirossian*, the trier of fact found that the written waiver each client had signed — which expressly stated that a conflict might exist with the other identified client and acknowledged the opportunity to consult with separate counsel concerning the issue — "was sufficient and valid." (*Mardirossian*, at p. 264.) In affirming the trial court's decision, the Court of Appeal did not disagree with this finding, but took an alternative course. Citing *Pringle*, the court first stated that whether "the breach of a rule of professional conduct . . . warrant[s] a forfeiture of fees . . . depends on the egregiousness of the violation." (*Mardirossian*, at p. 278.) It then held that, even if, as Ersoff contended, the waiver was insufficient because it "did not detail the conflicts at issue," "Ersoff ha[d] not shown the violation was particularly egregious or that he was in any way prejudiced by it. Under the circumstances, we cannot say the trial court abused its discretion in concluding it would be inequitable and an 'an unjust enrichment' if Ersoff's attorney fee obligation were to be excused " (*Id.* at p. 279.) The circumstances to which the court was referring were the following: After the law firm filed a complaint, worked on the

case for seven months, and prepared for depositions and a mediation, Ersoff fired the firm and hired a new one in which his wife was a partner. (*Id.* at p. 263.) Nine days later, Ersoff settled the case, with the defendants agreeing to pay him $3.7 million. (*Ibid.*) Leonard had "participat[ed] in the action to assist Ersoff." (*Id.* at p. 262.) Because *Mardirossian* involved (1) an *assumed* violation of a different rule, (2) "at most," only "a potential conflict of interest between" simultaneously represented clients on the same side of a single lawsuit (*id.* at p. 264), and (3) an attorney *who was fired by the client* and replaced by the client's wife's law firm about a week before a very lucrative settlement was reached (*ibid.*), it does not support the majority's conclusion that Sheppard Mullin may pursue quantum meruit recovery notwithstanding its knowing representation of actually conflicting interests without full disclosure and consent, which resulted in its disqualification by South Tahoe, not its firing by its client, J-M.

The last decision the majority cites — *Sullivan v. Dorsa* (2005) 128 Cal.App.4th 947 (*Sullivan*) — is even more far afield. That case did not involve a request for quantum meruit recovery; it involved the request of a referee in a property partition proceeding for an award of fees to the law firm he had hired to provide him with legal services in connection with that proceeding. (*Sullivan*, at pp. 950-953.) Nor did it even involve a payment dispute between an attorney and client. The client — the referee — was *in favor of the award*; it was the owners of the property, who were not "clients" of the law firm, who opposed the award. (*Id.* at p. 964.) They objected to the fee request to the extent it included services the law firm provided after negotiations began with a prospective purchaser with whom the law firm had an existing legal relationship. (*Id.* at pp. 963-964.) In rejecting this claim, the court focused first on the owners' lack of "standing" — as nonclients — "to protest the alleged representation of adverse interests." (*Id.* at p. 964.)

The *Sullivan* court, after discussing and quoting *Pringle* at length, then added that the owners had "fail[ed] to show that any violation of the rules

19

governing representation of adverse interests was *serious* enough to *compel* a forfeiture of fees." (*Sullivan*, *supra*, 128 Cal.App.4th at p. 965.) In this regard, the court failed to appreciate that *Pringle*'s discussion was dicta and that *Pringle* involved only a potential conflict of interest between multiple clients *on the same side in a single case*. The court also offered no detailed discussion of the facts, noting instead that the owners had failed to "cit[e] pertinent portions of the record" (*Sullivan*, at p. 964) to establish the "misconduct" they had "alleged" the law firm committed (*id.* at p. 965). Thus, the court did not discuss whether a law firm's simultaneous and knowing representation of clients whose interests are actually "adverse" (rule 3-310(C)(3)), without disclosing the conflict, *necessarily is* "inconsistent with the character of the [legal] profession," "incompatible with the faithful discharge of the attorney's duties," and a " 'serious violation of the attorney's responsibilities.' " (*Sullivan*, at p. 965.) "[R]epresentations marred by actual conflicts of interest exude the egregious and readily apparent divided loyalty of counsel." (*Commonwealth v. Cousin* (Mass. 2018) 88 N.E.3d 822, 831.) For these reasons, *Sullivan* does not support the majority's conclusion that Sheppard Mullin may, at "the discretion of the trial court," be entitled to quantum meruit recovery.[5] (Maj. opn., *ante*, at p. 40.)

---

[5] The majority's reliance on *Pringle*, *Mardirossian*, and *Sullivan* is problematic for an additional and important reason: all three are contrary to the majority's analysis insofar as they place the burden *on the client* to defeat recovery by showing that the ethical violation was serious and caused harm. (*Pringle*, *supra*, 73 Cal.App.4th at pp. 1006, 1007 ["On the record [the client] presented, we cannot ascertain if the purported violation of the rules was serious, if any act was inconsistent with the character of the profession," or if the attorney "had obtained or would expect to obtain confidential information which might have been harmful to one client, but helpful to another"]; *Mardirossian*, *supra*, 153 Cal.App.4th at p. 279 [client "has not shown the violation was particularly egregious or that he was in any way prejudiced by it"]; *Sullivan*, *supra*, 128 Cal.App.4th at p. 965 [clients "fail to show that any violation of the rules governing representation of adverse interests was *serious* enough to *compel* a forfeiture"].) The majority places the

20

Returning to *Huskinson*, another factor we cited there in holding that quantum meruit recovery was permissible is lacking in this case: a "policy determination" of the Legislature, expressed through statutes, "favor[ing] the availability of quantum meruit recovery" under the circumstances. (*Huskinson*, *supra*, 32 Cal.4th at p. 460.) As explained above, in holding in *Huskinson* that quantum meruit recovery is available when law firms violate ethical disclosure and consent requirements regarding fee-sharing agreements, we relied in part on the fact that two statutes regulating fee agreements "specif[y]" that, where a client voids an agreement for noncompliance, "the attorney remains 'entitled to collect a reasonable fee.' " (*Huskinson*, at p. 460.) I am aware of no statute — and neither Sheppard Mullin nor the majority cites one — reflecting a legislative policy determination that attorneys are entitled to a reasonable fee — or any other compensation — when they violate their duty of loyalty by undertaking to represent a client without disclosing a known and existing conflict with another client and obtaining both clients' informed consent to the simultaneous representation.

Finally, the last factor we discussed in *Huskinson* — "whether allowing recovery in quantum meruit would undermine compliance with" the violated ethics rule (*Huskinson*, *supra*, 32 Cal.4th at p. 459) — supports denying quantum meruit in this case. In *Huskinson*, we emphasized that the ethics rule violated there did not bar the law firm that was seeking recovery from working on the case or rendering services "on [the client's] behalf; it simply prohibit[ed] the dividing of [the client's] fees because she was not provided written disclosure of the fee-sharing agreement and her written consent was not obtained." (*Id.* at p. 463.) By contrast, in this case, the violated rule *did* preclude Sheppard Mullin from rendering services to J-M absent its informed consent. Thus, the risk Sheppard

___

burden on Sheppard Mullin to prove that its ethical violation "was neither willful nor egregious" and "was not so potentially damaging to the client as to warrant a complete denial of compensation." (Maj. opn., *ante*, at p. 40.)

Mullin faced if it disclosed to J-M that it was representing one of the entities suing J-M in the qui tam action was that J-M would decline to hire Sheppard Mullin and Sheppard Mullin would lose the representation in its entirety. Indeed, one must wonder why, other than that risk, Sheppard Mullin made a conscious decision after its conflicts check "identified" South Tahoe "as a client," not to disclose the representation to J-M and to instead deal with this situation through a generalized conflicts waiver that only referenced the possibility Sheppard Mullin "*may currently . . . represent one or more other clients . . . in matters involving*" J-M. (Italics added.)

Moreover, in "assum[ing]" in *Huskinson* that the law firm seeking recovery would "remain fully motivated to" comply with the ethical rule on fee-sharing agreements even if it obtained a quantum meruit award, we focused on the fact that a "contingent fee-sharing agreement[]" was at issue, such that "the negotiated fee" the law firm would lose if the fee-sharing agreement were not enforced "far exceed[ed] the amount of quantum meruit recovery," i.e., "the reasonable value of the work performed." (*Huskinson*, *supra*, 32 Cal.4th at p. 460.) No such all-or-nothing contingent fee agreement is at issue here, and it is likely that the disparity between the contractual fees and "the value of the services [Sheppard Mullin] rendered to" J-M (maj. opn., *ante*, at p. 2) is considerably less than the disparity that was at issue in *Huskinson*. "Because the [contractual] fee [likely does not] far exceed[] the amount of quantum meruit recovery, we may logically assume that" law firms facing the loss of a lucrative representation because of a known and existing conflict will not "remain fully motivated to comply with" rule 3-310(C) (*Huskinson*, at p. 460) if, as the majority holds, they may recover in quantum meruit "the value of the services [they] rendered" notwithstanding their decision not to disclose the conflict (maj. opn., *ante*, at p. 2).

In this regard, our decision in *Thomson v. Call* (1985) 38 Cal.3d 633 (*Thomson*) is instructive. There, the defendant — a member of the Albany City Council — sold land to the city for $258,000, thus violating a conflict of interest

22

statute that prohibited government employees from " 'be[ing] financially interested in any contract made by them in their official capacity, or by any body or board of which they are members.' " (*Id.* at p. 637, 638, fn. 2.) We held that the contract was void and unenforceable, that the city could keep the property, *and* that the defendant could not recover either on the contract or in quantum meruit, even though he had not committed fraud and had, in fact, relied on advice from the city attorney. (*Id*. at p. 646-652.) We considered, and rejected, several remedies "less severe than" complete forfeiture. (*Id.* at p. 651.) Allowing the defendant to recover "the fair market value of the land," we explained, would present a "serious problem," in that it would "provide[] only a weak incentive for public officials to avoid [conflicts of interest]. If they enter into such arrangements and 'get caught' in the . . . violation, this remedy would leave them as well off as they were prior to the transaction; if the violation goes unnoticed or unchallenged, they would profit from the deal." (*Ibid.*) Allowing such recovery would also be contrary to the conflict of interest statute's "prophylactic function," which was not to prevent "undue profit," but "to prevent conflicts of interest from occurring." (*Id.* at p. 652.) Allowing recovery of the amount the defendant originally paid for the land, although "provid[ing] some incentive for officials to avoid conflict-of-interest situations," would "also impl[y] that undue profit and loss to the city," rather than the prevention of conflicts, "are the primary concerns" of the statute. (*Ibid.*) On the other hand, we explained, complete forfeiture "provides a strong disincentive for those officers who might be tempted to take personal advantage of their public offices" (*id.* at p. 650), and "provides public officials with a strong incentive to avoid conflict-of-interest situations scrupulously" (*ibid.*). It also would "effectively implement[] the conflict-of-interest statutes' strict public policy goals." (*Id.* at p. 651.)

Similar considerations warrant complete forfeiture in this case. Allowing attorneys who fail to disclose known conflicts of interest to "recover[] the value of the services [they] rendered to" their clients (maj. opn., *ante*, at p. 2) would

23

"provide[] only a weak incentive for" attorneys to comply with rule 3-310(C) (*Thomson*, *supra*, 38 Cal.3d at p. 651). If they undertake a representation without disclosing a conflict, "and 'get caught' in the . . . violation, this remedy would leave them [better] off [than] they were prior to the transaction; [and] if the violation goes unnoticed or unchallenged, they [may] profit" even more. (*Ibid.*)

Allowing such recovery would also be contrary to rule 3-310(C)'s prophylactic function, which is to "protect[] the integrity of the attorney-client relationship," not to address "specific acts of disloyalty or diminution of the quality of the attorney's representation." (*Forrest v. Baeza* (1997) 58 Cal.App.4th 65, 74.) As discussed above, because of the duty of loyalty's vital and fundamental role in our legal system, "in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one" (*Flatt*, *supra*, 9 Cal.4th at p. 284), "regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other" (*SpeeDee*, *supra*, 20 Cal.4th at p. 1147). This rule "is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude . . . honest practitioner[s] from putting [themselves] in a position where [they] may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which [they] should alone represent." (*Anderson v. Eaton* (1930) 211 Cal. 113, 116 (*Anderson*).) Indeed, we have observed that these types of conflicts may "unconsciously" affect the decisionmaking even of attorneys "in good faith intending to discharge" their duty of loyalty to their clients. (*Id.* at p. 117.) "Conscience and good morals dictate that . . . attorney[s] should not so conduct [themselves] as to be open to the temptation of violating [their] obligation of fidelity and confidence." (*Ibid.*) Because "[t]he principle of loyalty is for the *client's* benefit," an attorney may simultaneously represent clients "whose interests are adverse as to unrelated matters provided full disclosure is made and both agree in writing to waive the

24

conflict." (*Flatt*, at p. 285, fn. 4.)  However, where, as here, full disclosure is not made and informed consent is not obtained, allowing quantum meruit recovery would be contrary to rule 3-310(C)'s prophylactic function, which is to prevent attorneys even "from putting [themselves] in a position" (*Anderson*, at p. 116) that may "tempt[]" them to violate their "obligation of fidelity" (*id.* at p. 117).

The majority finds *Thomson* unhelpful and uninstructive, but the majority's reasons are unconvincing.  The majority first emphasizes that the trial court in *Thomson*, in denying all compensation, "held a trial and tailored a remedy appropriate to the facts and equities." (Maj. opn., *ante*, at p. 39, fn. 16.)  However, as the majority later recognizes, there was " 'a long, clearly established line of cases' denying all recovery for" the kind of violation at issue in *Thomson*.  (Maj. opn., *ante*, at p.  39, fn. 16.)  As I have shown, there is also a line of cases denying all recovery for the kind of violation that Sheppard Mullin committed.  Moreover, the majority overlooks the fact that in *Thomson*, notwithstanding the trial court's conclusion, we *independently* "considered the possibility of" imposing  "less severe" penalties (*Thomson*, *supra*, 38 Cal.3d at p. 651), and we found those alternative penalties wanting because they lacked adequate deterrent impact and would poorly serve the prophylactic function of the conflict of interest statute there at issue (*id.* at pp. 651-652).  The majority offers no explanation or justification for its "different judgment about the range of remedies that will effectively avoid undermining incentives to comply with" the rule at issue here. (Maj. opn., *ante*, at p. 40, fn. 16.)

In fact, the majority offers no real discussion of deterrence at all.  Instead, without analysis, it simply directs trial courts to make case-by-case determinations of whether a quantum meruit award would, under the circumstances, "undermine incentives for compliance with the Rules of Professional Conduct." (Maj. opn., *ante*, at pp. 40-41.)  The majority cites no authority for this novel approach. Certainly, nothing in *Huskinson* or in *Thomson*, where we addressed the issue ourselves, suggests that trial courts should make such a case-by-case inquiry.  Nor

25

does the majority explain how trial courts are to make such case-by-case determinations. What factors should they consider? Is this part of the "the burden of proof" that the majority places on attorneys seeking quantum meruit recovery? (Maj. opn., *ante*, at p. 40.) If so, what constitutes evidence regarding the adequacy of the motivation to comply? Must the evidence address the effect of quantum meruit recovery on the motivation to comply, not just of the attorney seeking compensation in the case, but, as we discussed in *Huskinson*, of "all other similarly situated law firms and attorneys"? (*Huskinson*, *supra*, 32 Cal.4th at p. 460.) Again, how is a court supposed to determine this larger issue? Because the majority offers no standards to guide the inquiry, is a trial court's determination reviewable, or is it effectively standardless and unreviewable? If it is reviewable, then what standard of review applies? The majority offers no guidance on any of these questions.

Another consideration supporting my conclusion is one that J-M vigorously puts forth but that the majority barely acknowledges: the difficulty in determining whether the undisclosed conflict caused injury. J-M asserts that "it is extraordinarily difficult" — indeed "practically impossible" — "to prove that an attorney pulled punches due to divided loyalty," and that "a conflict can cause an attorney to compromise the client's case in myriad subtle ways that are, by their nature, almost impossible to assess." The United States Supreme Court made this similar observation in a case involving simultaneous representation of criminal defendants: "[A] rule requiring a defendant to show that a conflict of interests . . . prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application. . . . [I]n a case of joint representation of conflicting interests the evil . . . is in what the advocate finds himself compelled to *refrain* from doing . . . . [T]o assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require . . . unguided speculation." (*Holloway v. Arkansas* (1978) 435 U.S. 475, 490-491 (*Holloway*).)

26

J-M's assertions and the high court's discussion are fully consistent with our own recognition in *Anderson*, *supra*, 211 Cal. at page 117, that simultaneous representation may "unconsciously" affect the decisionmaking of even well-intentioned attorneys. There, we expressed concern that the conflict created by an attorney's dual representation of clients "might have unconsciously caused [the attorney] to accept an offer of compromise or settlement of [the client's] claim" — rather than "sue . . . for a large sum of money, as he had previously intimated . . . he would do" — so as not to harm the interest of another client. (*Id.* at pp. 117-118.) Here, during discussions leading up to the engagement agreement, Sheppard Mullin told J-M that one of its "goal[s]" as defense counsel would be "to stop the 'free ride' by small municipalities, and to force them to spend time and resources to substantiate their claim." Did Sheppard Mullin's follow through on this strategy as to South Tahoe, notwithstanding its ongoing attorney-client relationship with that entity? Did it take action "to force" South Tahoe — its client in other matters — "to spend time and resources to substantiate [its] claim" against J-M in the qui tam action? An inquiry into this question, and more broadly into whether Sheppard Mullin's simultaneous representation of J-M and South Tahoe harmed J-M, would require "unguided speculation." (*Holloway*, *supra*, 435 U.S. at p. 491.)

The majority says virtually nothing about this issue or J-M's arguments, only briefly acknowledging as an aside that "the harm resulting from a violation of the duty of loyalty [is] often . . . intangible and difficult to quantify." (Maj. opn., *ante*, at p. 42.) Even worse, the majority ignores its own recognition of this common difficulty and holds that the parties now must "litigat[e]" the question whether the undisclosed conflict "affected the value of [Sheppard Mullin's] work." (Maj. opn., *ante*, at p. 42.) And the majority imposes this requirement without considering how extensive the additional litigation surely will be, including discovery battles with J-M seeking interrogatory responses and deposition testimony from Sheppard Mullin attorneys regarding litigation tactics

27

and decisionmaking.  Nor does the majority discuss whether Sheppard Mullin will be responsible for J-M's costs in litigating these issues, which resulted *solely* from Sheppard Mullin's decision not to disclose its relationship to South Tahoe.  Rather than spawn more subsidiary litigation and raise a host of unanswered questions by allowing for quantum meruit recovery, we should hold that such recovery is unavailable under the circumstances of this case.

Finally, the other considerations the majority cites do not justify its conclusion that quantum meruit recovery may be available.  The majority emphasizes that Sheppard Mullin performed "many thousands of hours of legal work" before its disqualification.  (Maj. opn., *ante*, at p. 41.)  Of course, Sheppard Mullin is solely responsible for that circumstance, because it consciously decided not to disclose the conflict and was disqualified by South Tahoe when the facts later came to light.  The majority asserts that Sheppard Mullin "did seek and obtain J-M's written consent to the conflict." (*Ibid.*)  However, as the majority correctly holds, because Sheppard Mullin did not disclose the existing conflict, it neither sought nor obtained a *valid and effective* waiver.  The majority also asserts that Sheppard Mullin "may have been legitimately confused about whether South Tahoe was [a] current client when it took on J-M's defense." (*Ibid.*)  However, there is no *evidence* in the record that Sheppard Mullin thought South Tahoe was only a former client.  There is, however, undisputed evidence — the sworn declaration of its general counsel, D. Ronald Ryland — that before execution of the retention agreement, Sheppard Mullin ran "a conflicts check" and "identified South Tahoe . . . as a client in matters wholly unrelated to J-M."  According to other undisputed evidence, Sheppard Mullin simply concluded that, because of the waiver South Tahoe had signed, "there was nothing to disclose to J-M" and "there was no conflict" that "presented any issue regarding representing J-M in the Qui Tam action."  The majority also asserts that Sheppard Mullin "may in good faith have believed the engagement agreement's blanket waiver provided J-M with sufficient information about potential conflicts of interest." (*Ibid.*)  However, such

a finding would seem to be inconsistent with (1) the majority's no-nonsense and unqualified declaration that, "[s]imply put, withholding available information about a known, existing conflict is not consistent with informed consent" (*id.* at p. 28, fn. omitted), (2) the majority's conclusion that "at the time [it] agreed to represent J-M," Sheppard Mullin "knew" it "represented a client with conflicting interests, South Tahoe" (*id.* at p. 20), and (3) the majority's statement that even the case law on which Sheppard Mullin now relies "was clear" that disclosure of conflicts " 'known to an attorney at the time he seeks a waiver' " is *mandatory* " 'regardless of whether the client is sophisticated' " (*id.* at p. 27).

I disagree with the majority that, notwithstanding these considerations, we need a trial court to determine whether Sheppard Mullin's good faith is established by the absence "at the time" J-M retained Sheppard Mullin of an "explicit rule or binding precedent" (maj. opn., ante, at p. 42) that affirmatively and definitively precluded Sheppard Mullin from "withholding available information about [the] known, existing conflict" (*id*. at p. 28). Procedurally, it requires no factual development or credibility determination to decide whether the mere absence of such legal authority establishes good faith, so we are in as good a position as the trial court to decide that issue and need not commit this determination to the trial court's discretion. Substantively, I conclude that the mere absence of such legal authority cannot justify a finding that, because Sheppard Mullin had a "good faith" belief (*id*. at p. 41) it could "withhold[] available information about [the] known, existing conflict" (*id*. at p. 28), it should receive compensation. The majority's contrary conclusion will *tempt* and *encourage* attorneys to take advantage of their asserted "confus[ion]" or the absence of authority "explicit[ly]" precluding their conduct (*id.* at pp. 41-42) by testing the boundaries of their ethical obligations and engaging in questionable behavior that they may later attempt to justify as having been done in good faith. At least where the fundamental and inviolate duty of loyalty is at stake, we should instead adopt a rule that encourages attorneys to err on the side of caution, and to scrupulously honor their ethical obligations.

29

For the preceding reasons, I dissent insofar as the majority holds that Sheppard Mullin may be entitled to recover in quantum meruit the value of the services it rendered to J-M, notwithstanding Sheppard Mullin's failure to disclose its representation of South Tahoe.

**CHIN, J.**

**I CONCUR:**

**CANTIL-SAKAUYE, C. J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Company, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 244 Cal.App.4th 590
**Rehearing Granted**
_____

**Opinion No.** S232946
**Date Filed:** August 30, 2018
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Stuart M. Rice
_____

**Counsel:**

Greines, Martin, Stein & Richland, Kent L. Richland, Barbara W. Ravitz, Robert A. Olson and Jeffrey E. Raskin for Defendant and Appellant.

Steven W. Murray as Amicus Curiae on behalf of Defendant and Appellant.

Litigation Law Group, Gordon M. Fauth, Jr., and Rosanne L. Mah for Exponential Interactive, Inc., Halston Operating Company, LLC, Herbalife International of America, Inc., JDI Display America, Inc., Kimberly-Clark Corporation, Leaf Group Ltd., NETGEAR, Inc., Newegg Inc., Turo Inc., Varian Medical Systems, Inc., and VidAngel, Inc., as Amici Curiae on behalf of Defendant and Appellant.

Reuben Raucher & Blum, Stephen L. Raucher, Pokuaa M. Enin; Karpman & Associates and Diane L. Karpman for Beverly Hills Bar Association as Amicus Curiae on behalf of Defendant and Appellant.

Amar D. Sarwal, Mary L. Blatch; Liang Ly, John K. Ly and Jason L. Liang for Association of Corporate Counsel as Amicus Curiae on behalf of Defendant and Appellant.

Gibson, Dunn & Crutcher, Kevin S. Rosen, Theane Evangelis, Bradley J. Hamburger, Andrew G. Pappas, Heather L. Richardson and Jeremy S. Smith for Plaintiff and Respondent.

Spertus, Landes & Umhofer, James W. Spertus and Jennifer E. LaGrange for Amici Legal Scholars as Amicus Curiae on behalf of Plaintiff and Respondent.

Holland & Knight, Paul C. Workman, Peter R. Jarvis and Marissa E. Buck for Amici Law Firms as Amicus Curiae on behalf of Plaintiff and Respondent.

Samuel Bellicini; Fishkin & Slatter, Jerome Fishkin; Rogers Joseph O'Donnell and Merri A. Baldwin for The Association of Discipline Defense Counsel as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel:**

Sidley Austin, Mark E. Haddad, Joshua E. Anderson and David R. Carpenter for Professional Liability Insurers, AF Beazley Syndicate 623/2623 at Lloyd's, CNA Financial Corporation, Endurance US Holdings Corp., and W.R. Berkley as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kent L. Richland
Greines, Martin, Stein & Richland
5900 Wilshire Boulevard, 12th Floor
Los Angeles, CA  90036
(310) 859-7811

Kevin S. Rosen
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000